**S–G SECURITIES, INC., Plaintiff,**

v.

**The FUQUA INVESTMENT COMPANY and J. B. Fuqua, Defendants.**

**Civ. A. No. 78–2392–S.**

United States District Court,
D. Massachusetts.

Dec. 19, 1978.

Memorandum and Order on Motion for Reconsideration Jan. 17, 1979.

Brackett B. Denniston, III, Joshua M. Berman, Carol Goodman, Boston, Mass., Goodwin, Procter & Hoar, Boston, Mass., for plaintiff.

Robert Rothberg, Thomas F. Maffei, Mark A. Michelson, Choate, Hall & Stewart, Boston, Mass., for defendants; Milton S. Gould, Michael Lesch, Larry F. Gainen, Richard M. Goldstein, Shea, Gould, Climenko & Casey, New York City, of counsel.

## MEMORANDUM AND ORDER

SKINNER, District Judge.

Plaintiff, S–G Securities, Inc. ("S–G"), has moved for a preliminary injunction to restrain defendants Fuqua Investment Company ("FIC") and J. B. Fuqua, the president and sole shareholder of FIC, from acquiring additional shares of S–G common stock; from voting or otherwise exercising rights of ownership of S–G shares it now holds; and from otherwise attempting to influence or control S–G and its management. As grounds for such relief, plaintiff S–G alleges that FIC has violated various provisions of the Williams amendments to the Securities Exchange Act of 1934 (commonly known as "the Williams Act") and the rules promulgated thereunder and of Chapter 110C of the General Laws of Massachusetts, the Massachusetts takeover law, in connection with certain privately negotiated and open market purchases of S–G common stock. Defendants, in turn, have moved to dismiss this action for lack of jurisdiction; to dismiss the federal law claims for improper venue; or, alternatively, to transfer venue to the United States District Court for the Southern District of New York pursuant to 28 U.S.C. § 1404(a).

## I. THE PARTIES

Plaintiff S–G, a Delaware corporation organized in 1973 with its principal place of business in Massachusetts, is a regulated investment company registered under the Investment Company Act of 1940. S–G operates as a closed-end mutual fund invested primarily in debt and equity securities of corporations and real estate invest-

ment trusts. Plaintiff's capital structure consists of common and preferred stock, both of which are traded on the American Stock Exchange. As of September 14, 1978, S–G had outstanding 1,425,795 shares of common stock.

Defendant J. B. Fuqua, a Georgia resident, is president and sole shareholder of defendant FIC, a Georgia corporation organized on July 10, 1978 for the purpose of acquiring and holding the common stock of S–G.

## II. FACTS

In the latter part of 1977, J. B. Fuqua approached representatives of S–G with the proposal of a business combination between S–G and a Fuqua-controlled corporation. The preliminary merger discussions subsequently conducted by the parties in November 1977 proved fruitless.

Fuqua renewed his overtures to S–G in July 1978. Michael Tennenbaum, a partner in the investment banking firm of Bear, Stearns & Co., acting on Fuqua's behalf, arranged a meeting with representatives of S–G on July 12, 1978 in New York to discuss a possible tender offer for S–G common stock.

At the July 12th meeting, Fuqua proposed a cash tender offer for as many as 600,000 shares of the common stock of S–G at $3.00 per share if the S–G board of directors recommended to its shareholders acceptance of the tender offer, and at $2.50 per share if they did not.[1] The tender offer was to be made through FIC.

Following a meeting of the S–G board of directors on July 17 at which Fuqua's tender offer proposal was unanimously rejected, S–G drafted a press release stating in substance that it was engaged in discussions with several unnamed parties interested in purchasing S–G common shares or in

effectuating a merger with S–G and that these proposals were being evaluated by the S–G board of directors. This S–G draft was released at 5:40 p. m. EDT on July 17, 1978 to the PR Newswire service.

FIC, without knowledge of the actions of the S–G board of directors on July 17, issued its own public announcement on July 18, in which it disclosed the specific terms of its tender offer proposal for S–G common. The Dow Jones broad tape reported this public announcement at 3:09 p.m. EDT on July 18, 1978 as follows:

Atla–DJ–Fuqua Investment Co. said it is proposing a tender offer for between 475,000 and 600,000 shares of S–G Securities Inc. at a price of $3 a share.

Fuqua Investment Co. is wholly owned by J. B. Fuqua, Chairman and Chief Executive of Fuqua Industries, Inc.

The investment company said that if S–G's Board doesn't recommend acceptance of the offer it might make an offer for all of S–G's 1.4 million shares at $2.50 each.

At 4:20 p. m. EDT on July 18, 1978, a news wire service reported the contents of S–G's press release of July 17. This report also contained the statement of John Frabotta, President of S–G, that FIC was one of the suitors interested in S–G and restated in part the terms of the earlier reported FIC tender offer proposal. The substance of both the FIC and S–G press releases was reported in The Wall Street Journal on the following day, July 19.

The effect of these announcements in the marketplace was immediate. In the two week period from July 3 through July 14, S–G common stock had traded within a range of 1⅞–2 per share on an average trading volume of approximately 475 shares per day. On July 17, S–G common traded between 2⅛–2¼ on a volume of 3,800 shares.[2] On July 18, the date of the first

---

1. The lower price to be offered in the absence of director approval was based on a provision of the Massachusetts takeover statute, discussed *infra*, requiring that if the target company's board of directors refused to recommend acceptance of the takeover bid to its shareholders, the offeror must purchase all shares tendered even if the number of shares tendered

exceeded the number the offeror sought to purchase.

2. This rise in the price and volume of S–G on the American Stock Exchange on July 17 would not be attributable to S–G's press release since the announcement was issued after the close of trading.

public announcements, S–G traded between 2¼–2½ on a volume of 7,200 shares. On the following two days, July 19 and July 20, S–G's daily trading volume averaged 35,700 shares in a price range of 2½–2¾. Between July 18 and August 31, the date upon which FIC made its first open market and privately negotiated purchases, S–G traded within a range of 2¼–2⅞ on an average volume of greater than 6,800 shares per day.

At a meeting of the parties on July 26, S–G informed FIC that its board of directors had rejected the tender offer proposal. FIC then proposed a purchase of authorized but unissued S–G common shares. Negotiations over the terms of the possible purchase continued until August 14, 1978. On that date, FIC offered to purchase 700,000 authorized but unissued shares of S–G common at $3.50 per share subject to acceptance by noon EDT on August 17.

Also on August 14, FIC made a second public announcement in which it stated the terms of its August 14 offer. The FIC press release further stated that "[FIC] reserves the right, if today's offer is rejected to buy S–G shares in the market by tender or otherwise, but is not now committed to do so." The substance of FIC's press release was reported over the Dow Jones broad tape at 3:17 p. m. EDT and in the August 15 edition of The Wall Street Journal. S–G, in turn, issued another press release on August 18 reporting that it had rejected FIC's August 14 offer. This announcement was reported in The Wall Street Journal on August 19.

Shortly after S–G rejected FIC's August 14 proposal, FIC sought to obtain a control block of S–G stock through a series of privately negotiated transactions with shareholders and open-market purchases on the American Stock Exchange. Through these means, FIC accumulated a total of 400,000 shares of S–G between August 31 and September 11.

The first group of purchases by FIC of S–G common shares took place on the American Stock Exchange on August 31, as follows:

1) FIC purchased at $3 per share a block of 57,400 shares beneficially owned by Michael Tennenbaum and members of his family. These shares had been purchased by Tennenbaum prior to April 1978.

2) FIC purchased at $3 per share 110,600 shares owned by CAW Associates, a Connecticut limited partnership. Tennenbaum had telephoned Claude A. Wilson, the general partner of CAW Associates, in Connecticut on or about August 27 with a proposal to purchase CAW Associates' holdings in S–G, a proposal that Wilson accepted. CAW Associates had obtained its interest in the shares it sold prior to June 1978.

3) FIC purchased at $3 per share 65,000 shares owned by Gruss & Co., a New York brokerage firm engaged primarily in risk arbitrage. Gruss & Co. obtained its holdings in S–G through a series of purchases on the American Stock Exchange from July 18 through July 20, 1978. According to Martin Gruss, a partner in Gruss & Co., these purchases were made by Gruss & Co. for the purpose of risk arbitrage with the awareness of Fuqua's interest in S–G. This block sale, as with that of CAW Associates, was negotiated in August 1978 through the efforts of Tennenbaum. The selling shareholders or the principals thereof in all three of these privately negotiated transactions sold with the knowledge that defendants were purchasing large blocks of S–G common with the intention of gaining control of the issuer.

4) FIC executed two large open market purchases from four brokers through the Amex specialist in S–G common stock pursuant to the Exchange's "clean up" rules:

a) 15,000 shares at $2⅞ per share; and

b) 16,200 shares at $3 per share.

The next series of purchases took place from September 5 through September 7 when FIC purchased 20,200 shares of S–G common in the open market from various brokers in New York, Florida and Georgia.

In a third press release issued on September 8, as reported over the Dow Jones broad

tape and in The Wall Street Journal, FIC announced its purchases of S–G common stock to date, its intention to gain operating control of S–G, and the possibility that it might require additional S–G shares in the future. FIC also made its initial Schedule 13D filing [3] with the SEC on September 8 in which it disclosed its acquisitions of S–G common stock and its intention to acquire operating control of S–G.

The final large block purchase of S–G shares by FIC was made over the counter with the permission of the Amex on September 11. This privately negotiated purchase was of a block of 115,600 shares beneficially owned by Michael Milken with his brother Lowell Milken and by certain unnamed business associates of Michael Milken. Michael Milken is a senior vice-president and director of the brokerage firm of Drexel Burnham Lampert, Inc. This purchase was negotiated in September by Tennenbaum with Michael Milken. Lowell Milken and the unnamed associates relied upon Michael Milken's advice both in buying and selling their S–G holdings. The evidence reveals that the Milken brothers purchased a total of 20,500 shares of S–G during April and May of 1978 and on July 17, 1978. The Milken brothers purchased 64,900 shares of S–G after the public announcements on July 18. Michael Milken was aware of these announcements at the time these subsequent purchases were made. Of these shares, 47,300 were purchased prior to September 8, the date of FIC's third press release and Schedule 13D filing. Milken's associates purchased an additional 30,000 shares between August 9 and August 11, 1978.

Upon S–G's *ex parte* motion, an order was issued on September 12 temporarily restraining Fuqua and FIC from any further acquisition of S–G common stock.

## III. JURISDICTION AND VENUE

Defendants move to dismiss the federal claims for lack of jurisdiction and improper venue under Section 27 of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa.

Alternatively, defendants move pursuant to 28 U.S.C. § 1404(a) to transfer venue to the Southern District of New York. In the event the federal law claims are retained by this court, defendants move to dismiss the state law claims for lack of personal and subject matter jurisdiction.

### A. The Federal Law Claims

#### 1. Jurisdiction and Venue

■ Section 27 of the 1934 Act, 15 U.S.C. § 78aa, provides for both venue and personal jurisdiction in civil suits brought under the Act. Venue is proper in the district "wherein any act or transaction constituting the violation occurred." 15 U.S.C. § 78aa. To establish venue under Section 27, "[i]t is only necessary to show that an act in furtherance of the unlawful plan was committed within the district. . . ." *Wharton v. Roth*, 263 F.Supp. 922, 923 (E.D. N.Y.1964). *See Hooper v. Mountain States Securities Corporation*, 282 F.2d 195 (5th Cir. 1960), *cert. denied*, 365 U.S. 814, 81 S.Ct. 695, 5 L.Ed.2d 693 (1961). The venue-sustaining act need not constitute the core of the alleged violation, *Sohns v. Dahl*, 392 F.Supp. 1208, 1215 (W.D.Va.1975), nor even be illegal, *Mayer v. Development Corp. of America*, 396 F.Supp. 917, 929 (D.Del.1975), so long as "[it] represents more than an immaterial part of the alleged violations." *Sohns v. Dahl, supra*, at 1215.

■ The alleged violation consists of conducting an unlawful tender offer. A material part of this claimed violation is the transmission of defendants' press releases into this district and the publication thereof within this district through The Wall Street Journal and the Dow Jones broad tape. The transmission and dissemination of these press releases are sufficient to sustain venue in this district. *See Texas Gulf Sulphur Co. v. Ritter*, 371 F.2d 145, 148–149 (10th Cir. 1967); *Lemberger v. Westinghouse Electric Corporation*, [1976–77 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 95,762 at 90,740 (E.D.N.Y. Nov. ——, 1976). In addi-

---

**3.** Pursuant to 15 U.S.C. § 78m(d)(1), 17 C.F.R. § 240.13d–1.

tion, the consequences of defendants' activities had substantial impact on the operation of S–G's corporate headquarters in Boston. This as well is sufficient to confer venue in this district. *See Great Western United v. Kidwell,* 577 F.2d 1256 (5th Cir. 1978); *Travis v. Anthes Imperial Limited,* 473 F.2d 515, 529 (8th Cir. 1973). I conclude that venue is properly laid in this district.

■ Defendants further move to dismiss for lack of personal jurisdiction. Once it is established that venue is proper in the district in which the action under the 1934 Act is brought, service of process properly made is sufficient under Section 27 to establish *in personam* jurisdiction over the defendants even if they are not physically present in the forum and have not personally engaged in acts or transactions within the forum. *Warren v. Bokum Resources Corp.,* 433 F.Supp. 1360, 1364 (D.N.M.1977); *Sohns v. Dahl,* 392 F.Supp. at 1218; *Stern v. Gobeloff,* 332 F.Supp. 909, 911–914 (D.Md.1971).

■ Defendants consented to service of process made upon their counsel in this district. Such service was reasonably calculated to give them notice of the pendency of this action. *See Hanson v. Denckla,* 357 U.S. 235, 245, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958). They argue, however, that they lack the requisite minimum contacts with the Commonwealth of Massachusetts to satisfy the due process requirements of *International Shoe Company v. Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945). The *International Shoe* standard is applicable only where a state court asserts jurisdiction over an out-of-state defendant pursuant to that state's long-arm statute. Where an action is brought under the Securities Exchange Act of 1934 in a federal court, Section 27 provides for nationwide service of process. *Mariash v. Morrill,* 496 F.2d 1138, 1143 (2d Cir. 1974). As noted by the court in *Kramer v. Scientific Control Corp.,* 365 F.Supp. 780, 787 (E.D.Pa.1973), "Congress has the power to provide for the reach of service of process to the outer limits of the reach of its legislative power which, of course, is anywhere in the United States or its territories. (Citations omit-

ted)." Since defendants do not question the adequacy of service of process, I conclude that this court has personal jurisdiction over them in this action.

2. Transfer Pursuant to 28 U.S.C. § 1404(a)

■ Alternatively, defendants seek transfer of this action to the United States District Court for the Southern District of New York pursuant to 28 U.S.C. § 1404(a). The section provides that:

(a) For the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought.

In ruling on a § 1404 transfer motion, however, substantial weight must be attached to plaintiff's choice of forum. *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 508, 67 S.Ct. 839, 91 L.Ed. 1055 (1947); *Ford Motor Co. v. Ryan,* 182 F.2d 329, 330 (2d Cir. 1950), *cert. denied,* 340 U.S. 851, 71 S.Ct. 79, 95 L.Ed. 624 (1950). This consideration is particularly strong in an action brought under the Securities Exchange Act since the venue provision of the Act is designed to serve the underlying federal policy of allowing the plaintiff the widest possible choice of forums. *Lemberger v. Westinghouse Electric Corporation,* Fed.Sec.L.Rep. (CCH) ¶ 95,762 at 90,742.

■ Defendants point to several factors arguing in favor of transfer. First, defendants maintain that this action should be transferred to New York for the convenience of the parties. Plaintiff's headquarters and administrative offices are located in this district. Defendant Fuqua, on the other hand, is a Georgia resident, and defendant FIC has its offices in Georgia. In light of the slight time differential involved in air travel from Atlanta to Boston as opposed to New York, this argument is in no way persuasive.

The location of plaintiff's and defendants' general counsel in New York is a factor to be accorded little if any weight. *See Xerox Corporation v. Litton Industries, Inc.,* 353

F.Supp. 412, 415–16 (S.D.N.Y.1973). Further, defendants have not demonstrated that it would be unduly burdensome to photocopy and transport to this court whatever relevant books and records are in the possession of its New York counsel. *See Lemberger v. Westinghouse Electric Corporation,* Fed.Sec.L.Rep. (CCH) ¶ 95,762 at 90,742.

The convenience of witnesses is a factor that must be accorded weight. Defendants argue that New York is the more convenient forum for its witnesses. This consideration must be weighed against that of the convenience of plaintiff's witnesses located in this district. Further, defendants' principal witnesses would appear to be Fuqua himself and Michael Tennenbaum, a resident of Los Angeles, neither of whom would suffer any appreciably greater inconvenience in traveling to Boston rather than to New York. Defendants do list two defense witnesses, Martin Gruss and Claude Wilson, who are amenable to process under Rule 45(e), Federal Rules of Civil Procedure, in New York but not in this district. In light of the nature of their contemplated testimony and of the fact that defendants do not claim that these two witnesses would otherwise refuse to appear, however, I do not find that this consideration, albeit valid, tips the balance in favor of transfer. I conclude that on balance the factors in this case militate against transfer. The § 1404(a) transfer motion accordingly is denied.

### B. The State Law Claims

S–G requests injunctive relief for alleged violations of M.G.L. c. 110C, the Massachusetts takeover law. Defendants seek dismissal of the state law claims on the basis that this court lacks personal and subject matter jurisdiction.

 I deny defendants' motion to dismiss the state claims for lack of jurisdiction. The federal and non-federal claims in the case at bar arise out of a "common nucleus of operative fact" so as to permit this court to assume pendent jurisdiction over the state causes of action. *See United Mine Workers v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). Under current case law, personal jurisdiction was acquired for purposes of the pendent state claims as well as the federal claims by Section 27 extraterritorial service of process. *See Bertozzi v. King Louie Intern., Inc.,* 420 F.Supp. 1166, 1171–72 (D.R.I.1976) and the cases cited therein at 1172 n.2. *But see Wilensky v. Standard Beryllium Corp.,* 228 F.Supp. 703 (D.Mass.1964) and cases cited in *Bertozzi v. King Louie Intern., Inc., supra,* at 1171 n.1.

### IV. THE SUBSTANTIVE CLAIMS

 In order for a preliminary injunction to issue in this case, S–G must demonstrate that it has a strong likelihood of success on the merits of its claims and that irreparable harm will result if such relief is denied. *See Rondeau v. Mosinee Paper Co.,* 422 U.S. 49, 95 S.Ct. 2069, 45 L.Ed.2d 12 (1975); *Automatic Radio Mfg. Co. v. Ford Motor Co.,* 390 F.2d 113, 115–16 (1st Cir. 1968), *cert. denied,* 391 U.S. 914, 88 S.Ct. 1807, 20 L.Ed.2d 653 (1968).

### A. The Merits of Plaintiff's Section 14(d) Claim

S–G alleges that the defendants Fuqua and FIC have failed to comply with § 14(d) of the Williams Act [4] and the rules promulgated thereunder. The gravamen of the complaint under this section is that defendants failed to disclose information specified by Rule 14d–1 of the Rules and Regulations of the Securities Exchange Commission prior to making a tender offer for the common shares of S–G, and, further, that the manner in which defendants' tender offer was made failed to comport with the remedial provisions of §§ 14(d)(5)–(7).

Section 14(d)(1) of the Act and Rule 14d–1 provide that it is unlawful for any person to make a tender offer for, or a request or invitation for tenders of, *inter alia,* any equity security issued by a closed-end investment company registered under

4. 15 U.S.C. § 78n(d).

the Investment Company Act of 1940 if, after consummation thereof, such person would be the beneficial owner of more than 5 percent of the class unless such person has filed with the SEC at the time the offer, request or invitation is first made, a statement containing the information required by Rule 14d–1 as specified in Schedule 13D.[5] The defendants, in connection with privately negotiated and open market purchases of S–G common stock, filed a Schedule 13D with the Commission on September 8, 1978. The determination of whether defendants have violated § 14(d) depends on whether their actions prior to such filing can be construed as a "tender offer for, or a request or invitation for tenders of" S–G common stock within the meaning of the Act.

Sections 14(d)(5)–(7) of the statute are designed to insure equal treatment of all public shareholders of the target company in connection with a tender offer. These remedial provisions of the Act require that:

(1) tendering shareholders be permitted to withdraw shares tendered within seven days of the time the offer commences, and anytime after the expiration of 60 days from the original offer date if the offeror has not paid for the tendered securities;

(2) where the tender offer is for less than all outstanding shares of the class of the target corporation, all shares tendered during the first 10 days of the offer be purchased pro rata; and

(3) any increase in tender price be paid to every tendering shareholder, whether or not the shareholder tendered his shares pursuant to the original offer.

Defendants did not comply with these provisions. Defendants assert that their actions in connection with the acquisition of S–G common stock did not constitute a tender offer within the scope of the statute.

The resolution of this issue presents a difficult question in that the statute does not define what a "tender offer" is. Defendants' actions in acquiring S–G common stock do not constitute a "tender offer" as the term is conventionally understood.[6]

The statute has been liberally interpreted, however, to embrace securities transactions that do not fall within the traditional definition of a "tender offer" where such transactions posed the same potential dangers that § 14(d) was designed to alleviate.[7] The first and most frequently cited judicial expansion of the scope of § 14(d) beyond the conventional tender offer came in *Cattlemen's Investment Co. v. Fears,* 343 F.Supp. 1248 (W.D.Okla.1972), *vacated per stipulation,* Civil No. 72–152 (W.D.Okla., May 8, 1972). In that case the defendant had personally solicited by telephone, mail, and personal visits, virtually all of the public shareholders of the target company for the express purpose of acquiring control of the company. This campaign of solicitation resulted in a series of privately negotiated

---

5. The information required to be disclosed in the Schedule 13D includes in part: the background and identity of the persons on whose behalf the purchases are made, the source of funds used to make the purchases, and, if the purchases are made to acquire control of the issuer, any plans or proposals such persons may have to liquidate the issuer, to sell its assets, to merge it with any other persons, or to make any other major change in its business or corporate structure. *See* 15 U.S.C. § 78m(d)(1); 17 C.F.R. § 240.13d–101.

6. "In conventional tender offers the offeror typically offers to purchase all or a portion of a company's shares at a premium price, the offer to remain open for a limited time. Frequently, the obligation to purchase on the part of the offeror is conditioned on the aggregate number of shares tendered: if

more than a certain number are tendered, the offeror need not purchase the excess; if less than a certain number are tendered, the offeror need not purchase any. The shareholder responding to the offer generally must relinquish control of the shares he desires to tender until the response of others is determined. (Citations omitted)."
*Smallwood v. Pearl Brewing Company,* 489 F.2d 579, 597 n.22 (5th Cir. 1974), *cert. denied,* 419 U.S. 873, 95 S.Ct. 134, 42 L.Ed.2d 113 (1974).

7. *See generally,* Block and Schwarzfeld, "Curbing the Unregulated Tender Offer," 6 Securities Regulation Law Journal 133 (1978); Moylan, "Exploring the Tender Offer Provisions of the Federal Securities Laws", 43 Geo.Wash.L.Rev. 551 (1975); Note, "The Developing Meaning of 'Tender Offers' Under the Securities Exchange Act of 1934," 86 Harv.L.Rev. 1250 (1973).

purchases from a large number of shareholders during a relatively short period of time.

The court reiterated the axiom that a remedial statute such as the Exchange Act should be interpreted expansively to carry out the legislative purpose. The Congressional purpose underlying § 14(d), stated the court,

> is to provide investors who hold equity interests in public corporations, material information with respect to the potential impact of any effort to acquire control of a company, sufficient time within which to make an unhurried investment decision as to whether to dispose of or retain their securities, and to assure fair treatment of the investors.

*Cattlemen's Investment Co. v. Fears, supra,* at 1251. The court then concluded that the strictures of § 14(d) should apply since the defendants' active and widespread solicitation of the public shareholders contained "potential dangers which Section 14(d) of the statute is intended to alleviate," *i. e.,* that defendants' actions were "even more designed than . . . the more conventional type of 'tender offer' . . . to force a shareholder into making a hurried investment decision without access to information, in circumvention of the statutory purpose." *Id.* at 1252.[8]

■ I am persuaded by the reasoning of the cited cases that methods of stock acquisition other than the conventional tender offer fall within the purview of the tender offer provisions of the Williams Act. The question in the case at bar is whether defendants' method of acquisition of S–G common stock creates the same pressures and dangers, as in *Cattlemen's Investment Co. v. Fears, supra,* that the Williams Act was designed to prevent.

The legislative history indicates that the defendants' open market and privately negotiated purchases *per se* do not come within the ambit of the statute.[9] *See also, e. g., Kennecott Copper Corp. v. Curtiss-Wright Corp.,* 584 F.2d 1195 (2d Cir. 1978); *Financial General Bankshares v. Lance,* [Current Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 96,403 at 93,429 (D.D.C. Apr. 27, 1978); *D–Z Investment Co. v. Holloway* [1974–75 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 94,771 at 96,562–63 (S.D.N.Y. Aug. 23, 1974); *Nachman Corp. v. Halfred, Inc.,* Fed. Sec.L.Rep. (CCH) ¶ 94,455 at 95,592; *Water & Wall Associates Inc. v. American Consumers Indus., Inc.,* [1973 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 93,943 at 93,759 (D.N.J. Apr. 19, 1973). In each of the cited cases, however, the purchases in question were consummated prior to any widespread public announcement of a conventional tender offer or an independent buying program, proposed or actual. In two of the aforementioned opinions, the courts specifically observed that the market purchases in question were made prior to any public

---

8. *Accord, Smallwood v. Pearl Brewing Co., supra,* 489 F.2d at 596–99; *Nachman Corp. v. Halfred, Inc.,* [1973–1974 Transfer Binder] Fed. Sec.L.Rep. (CCH) ¶ 94,455 at 95,590 (N.D.Ill. Jul. 13, 1973) and the sources cited at note 1, *supra.*

9. During Congressional hearings on the bill, Senator Williams stated with respect to the disclosure provisions of § 14(d)(1) that:

> Substantial open market or privately negotiated purchases of shares may . . . relate to shifts in control of which investors should be aware. While some people might say that this information should be filed before the securities are acquired, disclosure after the transaction avoids upsetting the free and open auction market where buyer and seller normally do not disclose the extent of their interest and avoid prematurely dis-

> closing the terms of privately negotiated transactions.

See 113 Cong.Rec. 856 (1967).

Further, as noted in Note, 86 Harv.L.Rev. at 1276 n.137:

> Presumably, the same reasoning [as articulated by Senator Williams in reference to § 14(d)(1)] would bar the application of §§ 14(d)(5)–(7) to these types of transactions. In ordinary market transactions, no pressure is applied by the prospective purchaser on the selling shareholder; the latter reaches his decision to sell independently. In negotiated purchases from a few, substantial shareholders, pressure is also absent since these shareholders have the leverage to obtain the disclosure, time, and fair treatment necessary to make an informed, carefully considered decision on whether to sell their controlling interest.

announcement and without any widespread public knowledge of the purchasers' intention that would result in a tender offer subject to the Williams Act. *See Financial General Bankshares, Inc. v. Lance,* Fed.Sec. L.Rep. (CCH) ¶ 96,403 at 93,429; *Nachman Corp. v. Halfred, Inc.,* Fed.Sec.L.Rep. (CCH) ¶ 94,455 at 95,592. *See also* Note, 86 Harv. L.Rev. at 1279.

■ Defendants' purchases, in the case at bar, were preceded by two and, in part, by three widely publicized press releases issued by defendants that outlined with some specificity the details of the proposed buying program. The July 18th release discussed in detail the terms of the proposed tender offer both with and, alternatively, without approval of the S–G board of directors. The August 14th release alerted the public shareholders not only to the possibility of a conventional tender offer, but also to that of an independent buying program. These releases preceded all purchases in question. The third FIC release on September 8th announced the defendants' purchases of some 20 percent of the outstanding common stock of S–G within the preceding week, their intention to gain operating control of the company, and the possible acquisition of additional shares of S–G common stock in the future.

This publicity created a risk of the pressure on sellers that the disclosure and remedial tender offer provisions of the Williams Act were designed to prevent. As Judge Weinfeld noted in an analogous situation:

[When there has been no public announcement of a proposed offer,] . . . the purposes of the Williams Act would not be materially furthered by applying it to the offeror or the target company. When, however, a public announcement of a proposed offer has been made, the very dangers that the Act was intended to guard against came into play, and the application of sections 14(d) and 14(e) is thus appropriate.

*Applied Digital Data Systems, Inc. v. Milgo Electronic Corp.,* 425 F.Supp. 1145, 1155 (S.D.N.Y.1977).[10] *See also Anaconda Co. v. Crane Co.,* 411 F.Supp. 1208 (S.D.N.Y.1975); *ICM Realty v. Cabot, Cabot & Forbes Land Trust,* [1974–75 Transfer Binder] Fed.Sec.L. Rep. (CCH) ¶ 94,585 at 96,046 (S.D.N.Y. Jun. 6, 1974). The conditional language in which defendants' proposals were couched does not obviate the public shareholders' need for the protections of the tender offer provisions of the Williams Act once such proposals have been made public with the specificity and apparent genuineness evident in this case. *See Applied Digital Data Systems, Inc. v. Milgo Electronic Corp., supra,* at 1154–1155.[11]

■ I find no merit to defendants' arguments that their public announcements were required by Rule 10b–5, 17 C.F.R. § 240.10b–5.

I conclude that where there is:

1) a publicly announced intention by the purchaser to acquire a substantial block of the stock of the target com-

---

10. In *Applied Digital Data Systems, Inc. v. Milgo Electronic Corp., supra,* the public announcements related to a conventional exchange offer, also regulated by sections 14(d)–(e) of the Williams Act. *Id.* at 1151–1152. In the case at bar, the public announcements (1) comprise an element of a particular method of stock acquisition subject to the tender offer provisions of the Williams Act, and (2) as in *Applied Digital Data Systems, Inc. v. Milgo Electronic Corp., supra,* mark the point in time at which the protections of sections 14(d)–(e) apply.

11. Defendants argue that plaintiff's press release was the first to be issued and thus was responsible for any pressures brought to bear on the public shareholders. The limited gener-

al nature of plaintiff's press release would not have been sufficient to trigger the disclosure provisions of section 14(d)(1). Rule 14d–2(f), 17 C.F.R. § 240.14d–2(f) exempts the issuer from these provisions when its communication to shareholders, as here, does no more than (1) identify the tender offer referred to, (2) state that the issuer's management is studying the matter, and (3) request that shareholders defer making a determination whether to tender their shares or not until they have received management's recommendation. Regardless of which party's announcement was first in time, the protections of the tender offer provisions of the Williams Act were made applicable by defendants' announcements.

pany for purposes of acquiring control thereof, and

2) a subsequent rapid acquisition by the purchaser of large blocks of stock through open market and privately negotiated purchases,

such actions constitute a tender offer for purposes of § 14(d) of the statute.[12]

 I find that plaintiff is likely to establish that the facts in this case are as stated in the preceding paragraphs and therefore has satisfied its burden of showing a likelihood of prevailing on the merits of its claim that the methods by which defendants acquired its S–G stock holdings were in violation of section 14(d).

### B. The Merits of Plaintiff's Section 13(d) Claim

Plaintiff claims that the Schedule 13D filed by defendants on September 8, 1978 pursuant to section 13(d) of the Act, 15 U.S.C. § 78m(d), is deficient in that the statement fails to truthfully describe defendants' plans for S–G.[13] Item 4 of Schedule 13D, 17 C.F.R. § 240.13d–101, requires the party filing the statement to disclose:

the purpose or purposes of the purchase or proposed purchase of securities of the issuer. If the purpose or one of the purposes of the purchase or proposed purchase is to acquire control of the business of the issuer, describe any plans or proposals which the purchasers may have to liquidate the issuer, to sell its assets or to merge it with any other person(s), or to make any other major change in its business or corporate structure, including, if the issuer is a registered closed-end investment company, any plans or proposals to make any changes in its investment policy for which a vote would be required by section 13 of the Investment Company Act of 1940.

The Schedule 13D filed by defendants disclosed in relevant part that:

FIC has given and will continue to give consideration to what future action, if any, it may wish to take with respect to the Common Shares remaining unpurchased by it after it acquires operating control of the Issuer. Among other things, FIC will consider whether to seek to acquire all or a portion of the remaining Common Shares through open market purchases, through a tender offer, or by other means deemed advisable by it; or whether to propose a merger or similar combination transaction with FIC or a wholly-owned subsidiary of FIC, or other transaction involving the Issuer . . .

If FIC succeeds in acquiring operating control of the Issuer, it expects to make a careful review and analysis of the Issuer's operations and financial condition, and may, on the basis of such a review and analysis, make a determination that the Issuer will continue the investment policies now in effect or, as an alternative, adopt a different investment policy, or possibly, if necessary shareholder and Commission approval is obtained, cause the Issuer to become a nondiversified investment company, a holding company or an operating company, and no longer to be subject to the 1940 Act.

S–G argues that these statements are plainly contrary to defendant Fuqua's definite plans to convert S–G to an operating company geared to corporate acquisition.

 Defendants have disclosed that the conversion of S–G to an operating company is a possibility—with two valid caveats: that both shareholder and SEC approval be obtained prior to such a change. S–G has not shown that defendants had any more definite plans than those disclosed in

**12.** *See* Aranow, Einhorn and Berlstein, *Developments in Tender Offers for Corporate Control* 7–8 (1977). *But see id.* at 14–17.

**13.** Section 13(d) of the Williams Act requires certain public disclosures by persons acquiring substantial blocks of an equity security issued by a closed-end investment company registered

under the Investment Company Act of 1940. Within ten days after acquiring the beneficial ownership of more than five percent of a class of such security, a person must provide certain information, *see* note 3 *supra*, to the issuer, to each exchange upon which the security is traded, and to the SEC.

the Schedule 13D. I am mindful of Judge Friendly's caution that "[i]t would be as serious an infringement of these [SEC] regulations to overstate the definiteness of the plans as to understate them." *Electronic Specialty Co. v. International Controls Corp.,* 409 F.2d 937, 948 (2d Cir. 1969). *See also, e. g., Susquehanna Corp. v. Pan American Sulphur Co.,* 423 F.2d 1075, 1085–86 (5th Cir. 1970). *Cf. Weeks Dredging & Contracting, Inc. v. American Dredging Co.,* 451 F.Supp. 468, 484 (E.D.Pa.1978) (in context of alleged section 14(e) violation). Further, "[t]arget companies must not be provided the opportunity to use the future plans provision as a tool for dilatory litigation." *Susquehanna Corp. v. Pan American Sulphur Co., supra,* at 1086. While the degree of specificity with which future plans must be detailed in Schedule 13D filings presents a difficult question, I find that on the facts here presented plaintiff has not shown a violation of section 13(d) on these grounds.

 S–G further contends that Fuqua has violated section 13(d) by failing to disclose his plans to change management. While Fuqua may indeed have such plans, "the ordinary meaning of 'change in . . corporate structure' would not seem to include . . . changes in management." *Nachman Corp. v. Halfred, Inc.,* Fed.Sec.L. Rep. (CCH) ¶ 94,455 at 95,593. I conclude that S–G has not shown a violation of section 13(d) on these grounds either.[13a]

C. The Merits of Plaintiff's Section 14(e) Claim

 S–G charges that defendants have committed two violations of section 14(e) of the Act:[14] (1) by announcing a tender offer on July 18th and then purchasing S–G stock by other means; and (2) by publicly an-

nouncing on August 14th that a tender offer was still a possible means of stock acquisition. While defendants' public announcements in combination with their open market and privately negotiated purchases constitute a "tender offer" for purposes of section 14(d)–(e), defendants' actions cannot be bootstrapped into a violation of the antifraud provisions of section 14(e) absent a showing that these statements were intentionally and materially misleading—a showing that S–G has not made. *See Chris-Craft Industries, Inc. v. Piper Aircraft Corp.,* 480 F.2d 341, 362–64 (2d Cir. 1973), *cert. denied,* 414 U.S. 910, 94 S.Ct. 231, 38 L.Ed.2d 148 (1973) (adopting the principles of Rule 10b–5 in determining whether section 14(e) had been violated).

 Defendants' July 18th announcement did not violate section 14(e) since it was made without knowledge that plaintiff had rejected its tender offer proposal. Defendants' August 14th announcement that a tender offer was a possible means of stock acquisition did not constitute a section 14(e) violation either. S–G has not shown that defendants had eliminated a conventional tender offer as a means of acquiring S–G stock as of August 14th. While a tender offer conducted pursuant to the originally proposed terms may no longer have been contemplated, such an offer made on different terms or at a time when the market price of S–G had returned to its pre-announcement levels was certainly possible. Finally, S–G has not shown that these statements were made with fraudulent, deceptive, or manipulative purpose.

D. The Merits of Plaintiff's Claim under the Massachusetts Takeover Statute

 Defendants argue that plaintiff has little likelihood of success on the merits of

---

**13a.** This conclusion was reached on the basis of the law prior to the effective date of the amendment of Form 13D by the SEC, namely May 30, 1978. See order on reconsideration, *infra.*

**14.** Section 14(e), 15 U.S.C. § 78n(e), of the Williams Act provides that

It shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in

order to make the statements made, in the light of the circumstances under which they are made, not misleading, or to engage in any fraudulent, deceptive, or manipulative acts or practices, in connection with any tender offer or request or invitation for tenders, or any solicitation of security holders in opposition to or in favor of any such offer, request, or invitation. . . .

its claim under Chapter 110C of the General Laws of Massachusetts because it lacks standing under the statute. Unlike the Williams Act, the Massachusetts statute provides certain express remedies. The statute provides that the selling shareholder may bring against the offeror either an action for damages or a suit in equity for violations thereof. G.L. c. 110C, § 9. The statute also provides in section 9 that

> (e) Whenever it appears to the [state] secretary that any person has engaged or is about to engage in any act or practice constituting a violation of this chapter, or any rule or order hereunder, . . . (2) he may bring an action in the district court of the appropriate county to enjoin the acts or practices and to enforce compliance [therewith] . . ., or he may refer the matter to the attorney general or the district attorney of the appropriate county.

The statute nowhere mentions any right or remedy in the target company.

Furthermore, the Massachusetts takeover law contains provisions not found in the Williams Act. These provisions require, *inter alia*,

1) advance notice of the tender offer. M.G.L. c. 110C, § 2.
2) extensive disclosure not otherwise required under the Williams Act. M.G.L. c. 110C, § 4.
3) that the offer remain open for no less than sixty days. M.G.L. c. 110C, § 7.
4) that, if the offer is for less than all of the outstanding equity securities of a class, the offeror must purchase all shares tendered. M.G.L. c. 110C, § 7.
5) that shareholders be permitted to withdraw shares tendered at any time up to five days prior to the announced termination date of the offer. M.G.L. c. 110C, § 7.

The statute also exempts from its strictures any tender offer to which the board of directors of the target company consents. M.G.L. c. 110C, § 1.

A similar Idaho statute was held invalid under the supremacy and commerce clauses of the United States Constitution by Judge Wisdom in *Great Western United Corp. v. Kidwell,* 577 F.2d 1256.

Because of the doubts thus raised, I am not satisfied that the plaintiff has established a likelihood of success on the merits under the Massachusetts statute, and accordingly I will not take it into account in granting preliminary relief.

## V. APPROPRIATE INJUNCTIVE RELIEF

 Although plaintiff has demonstrated a strong likelihood of success on the merits of its section 14(d) claim, it must further demonstrate that irreparable harm will result from the Williams Act violation unless injunctive relief is granted. *See Rondeau v. Mosinee Paper Corp.,* 422 U.S. at 60–65, 95 S.Ct. 2069, 45 L.Ed.2d 12 (1975); *General Aircraft Corp. v. Lampert,* 556 F.2d 90, 96 (1st Cir. 1977). Liability under the Williams Act, without more, is not sufficient to justify the issuance of an injunction in the absence of the traditional prerequisites for equitable relief. *Id.* Furthermore, in light of the *Rondeau* Court's admonition that the provisions of the Williams Act were not designed to assist incumbent management in its resistance to takeovers, *Rondeau v. Mosinee Paper Corp., supra,* at 58–59, the harm threatened must be not to the plaintiff S–G but to those whom section 14(d) was designed to protect—the S–G shareholders and the investing public. *See General Aircraft Corp. v. Lampert, supra,* at 96–97; *Klaus v. Hi-Shear Corp.,* 528 F.2d 225, 231–32 (9th Cir. 1975). Even then, the injury to the public shareholders of S–G must not be such as could be adequately redressed by way of money damages. *See Rondeau v. Mosinee Paper Corp., supra,* at 59–60.

 As the Supreme Court noted in a case subsequent to *Rondeau,* however, "in corporate control contests the stage of preliminary injunctive relief, rather than post-contest lawsuits, 'is the time when relief can best be given.'" *Piper v. Chris-Craft Industries, Inc.,* 430 U.S. 1, 41–42, 97 S.Ct. 926, 949, 51 L.Ed.2d 124 (1977), citing with

approval Judge Friendly's opinion in *Electronic Specialties Co. v. International Controls Corp.*, 409 F.2d at 947.[15]

█ Plaintiff urges that defendants be enjoined from acquiring additional shares of S–G common and from voting those shares they presently hold. Such drastic relief is not appropriate in light of the Supreme Court's admonition that "[t]he historic injunctive process was designed to deter, not to punish." *Hecht Co. v. Bowles,* 321 U.S. 321, 329, 64 S.Ct. 587, 592, 88 L.Ed. 754 (1944), quoted with approval in *Rondeau v. Mosinee Paper Corp., supra,* at 61, 95 S.Ct. 2069, 45 L.Ed.2d 12.

It is not clear that the S–G shareholders who have retained their shares will be irreparably harmed unless the defendants are enjoined from making further purchases and from voting the stock presently held by FIC. If FIC is allowed to continue its tender offer, these shareholders will have the option of selling their interests at the elevated market prices that the former S–G shareholders who sold their shares between July 18 and September 11 received. The S–G shareholders who have retained their shares will be harmed only if defendants are allowed to proceed with the tender offer without extending the protections of section 14(d) to them.

Defendants therefore are enjoined from acquiring additional shares of S–G common stock through open market and privately negotiated purchases until further order of this court. Defendants may, however, acquire additional S–G common shares by means of a conventional tender offer conducted in compliance with the disclosure and remedial provisions of section 14(d). The injunction that shall issue in conjunction with this opinion represents a material change in the facts requiring defendants to amend the Schedule 13D currently on file with the Commission.

█ The relief required to prevent irreparable harm to those shareholders who have sold their shares since July 18, 1978, the date upon which the protections of section 14(d) should have been applied, presents a more difficult question. Those investors who sold after the public announcements of July 18 did so at enhanced market prices and without a pro rata limit on the number of shares sold. Even if defendants should conclude a tender offer at a price higher than that at which a particular selling shareholder sold, that shareholder may pursue his or her remedy through an action for money damages.

The harm requiring injunctive relief as to this group of former shareholders would be to those shareholders who sold their interests without knowledge that defendants were attempting to obtain control of S–G. *See Financial General Bankshares, Inc. v. Lance,* Fed.Sec.L.Rep. (CCH) ¶ 96,403 at 93,427–428. These shareholders have been denied the opportunity to make an informed decision whether or not to sell their stock to a party attempting a takeover. As to these shareholders, a damages remedy would be insufficient. *Id.*

While the First Circuit has indicated that disenfranchisement may be an appropriate remedy where the shares were rapidly acquired immediately prior to a control contest during a period of time in which the purchaser was in violation of the Williams Act, *see General Aircraft Corp. v. Lampert,* 556 F.2d at 97;[16] a less drastic and equally

---

**15.** The [Supreme] Court's reference [in *Rondeau* to the absence of an imminent control contest] suggests, of course, that equitable measures may be appropriate when a takeover attempt follows on the heels of a belated and/or defective filing, or where, indeed, there has been no effort whatsoever at compliance. *Universal Container Corp. v. Horwitz,* [1977–78 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 96,161 at 92, 255–56 (S.D.N.Y. Sept. 6, 1977), cited by the court in *Financial General Bankshares v. Lance,* Fed.Sec.L.Rep. (CCH) ¶ 96,403 at 93,428

n.41. *See also General Aircraft Corp. v. Lampert, supra,* at 97. The court in *Horwitz* made its observations in the context of a section 13(d) violation; those observations are equally valid, if not more so, in the face of a violation of section 14(d).

**16.** *Accord, Financial General Bankshares v. Lance, supra,* at 93,427 (divestiture or disenfranchisement may be the appropriate remedy where defendants obtained effective control of the issuer as a result of purchases made in violation of section 13(d)).

appropriate remedy is available. Under analogous circumstances, the court in *Financial General Bankshares, Inc. v. Lance, supra,* at 93,428, enjoined defendants from acquiring additional shares in the target company until they had offered rescission to those persons from whom they had purchased the target company's stock on the open market. The rationale for such relief was that these shareholders who sold without knowledge of the takeover attempt would be irreparably harmed unless defendants offered them rescission before defendants obtained control of the issuer. This relief was analogized to relief ordered by some courts in the conventional tender offer situation in which the continuation of the tender offer was preliminarily enjoined "unless shareholders who tendered during a section 14(d) violation [were] first given the opportunity to withdraw their tendered shares." *Id.* at 93,428 n.40. *See also Electronic Specialty Co. v. International Controls Corp.,* 409 F.2d at 947.

I find this remedy appropriate in this case where the shareholders who sold on the open market directly to FIC did so at a time when defendants were in violation of section 14(d), and the defendants had not yet obtained control of S–G. Defendants are hereby enjoined from voting those shares so acquired and from acquiring additional shares of S–G by tender offer or otherwise until they have offered rescission to those uninformed shareholders from whom they purchased on the open market on August 31, 1978 and on September 5 through September 7, 1978.

Excluded from the benefits of the foregoing are certain large shareholders who sold to FIC on August 31 and September 11. These shareholders or the principals thereof —Tennenbaum, Gruss, Wilson, and Milken—sold at a premium price and with the knowledge that defendants were engaged in a takeover attempt. These shareholders have an adequate remedy at law for any injury caused them by defendants' section 14(d) violation and should not be offered rescission. *See Financial General Banks-*

*hares, Inc. v. Lance, supra,* at 93,427, 93,428 n.39.

Certain relief is required, however, with respect to those shares sold to defendants by Gruss & Co. and by the Milken group. Gruss & Co. and the Milken group obtained the S–G stock which they subsequently sold to defendants in whole or in part through open market purchases made after defendants' July 18, 1978 announcement. The shareholders who sold to these parties after that time when defendants were in violation of section 14(d), like those shareholders who sold directly to FIC on the open market, will suffer irreparable harm in that they have been denied the opportunity to decide whether or not to sell, albeit indirectly, to a party attempting a takeover. The transactions between these shareholders and Gruss & Co. and the Milken group and, subsequently, between Gruss & Co. and the Milken group and FIC were conducted at arm's length. Nevertheless, it seems proper under the circumstances to view Gruss & Co. and the Milken group, having purchased these shares in response to defendants' announcements for purposes of arbitrage or short term investment, as conduits through which FIC, while in violation of section 14(d), was able to purchase S–G common from those shareholders who sold on the open market after defendants' July 18, 1978 announcement without knowledge of FIC's takeover attempt.

While rescission is technically impossible as to this group of shareholders, there does appear to be a satisfactory alternative form of relief similar to rescission that avoids the drastic measure of disenfranchisement. Defendants are preliminarily enjoined from acquiring additional S–G shares until they offer to resell to this group the number of shares that each former shareholder sold to Gruss & Co. and the Milken group during this time period at the price at which such sale was originally made. All former shareholders to whom rescission or resale is offered are to be informed of defendants' intention to obtain control of S–G.

Pending the completion of the offer, defendants are enjoined from voting any of the stock acquired from Gruss & Co. and the Milken group which was itself acquired on the open market after defendants' July 18, 1978 announcement.

## MEMORANDUM AND ORDER ON PLAINTIFF'S MOTION FOR RECONSIDERATION

In its brief on its motion for a preliminary injunction, plaintiff alleged that defendant had violated section 13(d) of the Securities Exchange Act of 1934 by failing to include in its Schedule 13D a statement that it would change the management of plaintiff if it was successful in achieving stock control. For the requirements of Schedule 13D, plaintiff's counsel cited 17 C.F.R. § 240.13d–101. Finding there no requirement with respect to change of management, I found no violation of section 13(d), citing *Nachman Corporation v. Halfred, Inc.*, [1973–74 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 94,455 at 95,593 (N.D. Ill. Jul. 13, 1973).

Plaintiff now moves for reconsideration of this ruling, pointing out that Schedule 13D was amended by the SEC as of May 30, 1978. The amendment has not yet been codified, but appears at 43 Fed.Reg. 18484, 18498 (1978). This useful information was not made clear to me at the original hearing.

■■■ The record indicates clearly that the defendant Fuqua, who controls FIC, had formed the intention to change the S–G management prior to the filing of the Schedule 13D, and continued in that intention during all the relevant period. It is equally clear that the amended Schedule 13D required that this intention be revealed. The defendants were therefore in violation of section 13(d). My order of December 19, 1978 is amended to reflect the findings and rulings of this paragraph.

It does not follow that any change is required in the injunctive relief heretofore granted. Not every violation of section 13(d) requires injunctive relief at the instance of a private litigant, and the court must consider the balancing equities before laying on its heavy hand.

The plaintiff's clarification hits the light of day in the middle of a rather elaborate and carefully scheduled rescission program ordered by the court. The question is whether the selling stockholders need to be explicitly told of Fuqua's plan to change management in order to make an intelligent, informed judgment as to rescission.

I have carefully reviewed the existing Schedule 13D which is to be mailed with the rescission offer. There is explicit reference therein to the likelihood that FIC will be able to elect all three directors of S–G and will assume operating control, may change the business of S–G, or may merge it into one of its wholly-owned subsidiaries. While not explicitly stated, the probability of a change in management incidental to one or more of these projected events could not have escaped even an unsophisticated investor. I am not persuaded that the inclusion of a statement of Fuqua's expressed intention to change management would sufficiently increase the likelihood of informed stockholder decisions as to be worth interfering with the rescission offer now in progress.[1] The Supreme Court has made it clear that the fashioning of relief is separate from the establishment of liability under the securities acts, and that the former is to be governed by traditional equitable considerations. *Rondeau v. Mosinee Paper Corp.*, 422 U.S. 49, 60–65, 95 S.Ct. 2069, 45 L.Ed.2d 12 (1975). One of these traditional considerations is embodied in the maxim *de minimis non curat lex.*

Accordingly, as a matter of equitable discretion, I decline to modify the preliminary injunction issued December 19, 1978, or the order prescribing the form of the rescission offer issued December 28, 1978.

---

1. It is not clear from the materials produced that as far as S–G is concerned, there is much in the way of "management" aside from the Board of Directors.