**SECURITIES AND EXCHANGE COMMISSION, Plaintiff,**

v.

**CARTER HAWLEY HALE STORES, INC., Defendant.**

**No. CV 84–3149 AWT.**

United States District Court, C.D. California.

May 9, 1984.

**1250**

John M. Fedders, Gary Lynch, Burton W. Wiand, Linda D. Fienberg, Thomas O. Gorman, S.E.C., Washington, D.C., Robert D. Laframenta, David Casterline, S.E.C., Los Angeles, Cal., for S.E.C.

Michael H. Diamond, Michael W. Mitchell, James E. Lyons, Skadden, Arps, Slate, Meagher & Flom, Los Angeles, Cal., William W. Vaughn, Robert C. Vanderet, O'Melveny & Myers, Los Angeles, Cal., for Carter Hawley Hale Stores, Inc.

## MEMORANDUM DECISION AND ORDER

TASHIMA, District Judge.

On April 3, 1984, The Limited, Inc. ("Limited") announced and on April 4 commenced a cash tender offer for 20.3 million shares of Carter Hawley Hale Stores, Inc. ("CHH") common stock, just over one-half of the shares then outstanding, at $30 per share (the "Offer"). Two days before this announcement, CHH common, which is listed on both the New York Stock Exchange ("NYSE") and the Pacific Stock Exchange ("PSE"), traded at approximately $23–⅞ per share. The Offer provided that it would remain open for twenty business days, that tendered shares could be withdrawn until April 19, 1984, and that shares were subject to purchase on a *pro rata* basis if tenders exceeded 20.3 million shares. Limited further stated its intention to exchange 1.32 shares of its common stock for each remaining outstanding share of CHH common stock if the Offer were successful, in a second-step merger of the two companies.

Immediately after the Offer was announced, CHH commenced an action in this Court. In its amended complaint, filed on April 6, CHH alleged that Limited's intended acquisition of CHH will violate § 7 of the Clayton Act, 15 U.S.C. § 18, and that the Offer violated §§ 10(b), 14(d) and 14(e) of the Securities Exchange Act of 1934, as amended by the Williams Act (the "Exchange Act"), 15 U.S.C. §§ 78j(b) 78n(d), and 78n(e).[1]

On April 16, 1984, CHH publicly announced that it had entered into an agreement with General Cinema Corporation ("General Cinema") pursuant to which CHH sold 1 million shares of convertible preferred stock to General Cinema for $300 million. The preferred stock possessed a vote equivalent to 22 percent of the voting securities then outstanding (equal to 11.111 million shares of common). Under the agreement, the preferred stock was to be voted in accordance with the recommendation of a majority of CHH's Board of Directors, except in certain specified circumstances. Further, as a class, the convertible preferred has the separate right to approve any merger, reorganization or similar business combination.[2] In addition, CHH granted General Cinema an option to buy CHH's Walden Book Company, Inc. subsidiary for approximately $285 million. Finally, CHH's Board further authorized

1. *Carter Hawley Hale Stores, Inc. v. The Limited, Inc., et al.,* 587 F.Supp. 246 (the "private action"). On April 27, CHH's application for a preliminary injunction was denied. The Clayton Act claim was dismissed for lack of standing and for failure to define a relevant market. Because Limited's April 26 amendment of the Offer effectively eliminated the second-step exchange of shares, the request for preliminary injunctive relief based on claimed violations of the Exchange Act was deemed moot and denied without prejudice.

2. Such class voting rights on a statutory "reorganization" are apparently required by the California General Corporation Law, Cal.Corp.Code § 1201, which governs the affairs of CHH.

the repurchase of up to 15 million shares of its common stock and the expenditure of up to $500 million for that purpose. CHH also disclosed that if it repurchased all of these shares, the General Cinema convertible preferred would possess a vote equivalent to 33 percent of CHH's voting securities then outstanding. CHH stated that the General Cinema transactions and the stock repurchases were "being made to defeat the attempt by The Limited to gain voting control of the Company and to afford shareholders who wish to sell their shares at this time an opportunity to do so."

CHH disclosed its April 16 actions by a press release, a letter from its Chairman to its shareholders and by its Schedule 14D–9 and Rule 13e–1 Transaction Statement filings with the Securities and Exchange Commission ("SEC"). These disclosures were reported by wire services, national financial newspapers and newspapers of general circulation throughout the country. On April 16, 1984, after the NYSE had closed, at approximately 4:00 p.m., E.S.T., CHH began to repurchase its shares on the PSE. In a one hour period, CHH purchased approximately 244,000 shares of its common stock at an average price of $25.25 per share.[3] On April 17, CHH purchased approximately 6.5 million shares of its common stock in a two hour period at an average price of $25.88 per share. CHH's purchases on that date amounted to approximately 18 percent of the shares of its stock then outstanding. During the next four trading days, CHH continued to purchase its shares. CHH announced on April 22 that its Board had increased the number of shares authorized for purchase from 15 million to 18.5 million. At the end of the seven (trading) day period from April 16 through April 24, CHH had purchased approximately 17.9 million shares, over 50%

of the shares of CHH common stock outstanding before CHH began its repurchase program.

On April 24, Limited announced that it was revising the Offer in light of CHH's defensive actions and an amendment to the Offer became effective on April 26 (the "Amended Offer"). Under the Amended Offer, the second-step exchange of shares is eliminated and the price per share is increased to $35. The Amended Offer expires on midnight, May 9, 1984.

The SEC filed this action on May 2, 1984, two and one-half weeks after the repurchase program was announced and one week after its apparent completion. The complaint alleges that CHH's stock repurchase program constitutes an illegal tender offer in violation of § 13(e)(1) of the Exchange Act, 15 U.S.C. § 78m(e)(1), and SEC Rule 13e–4 promulgated thereunder, 17 C.F.R. § 240.13e–4. On May 5, the SEC's application for a temporary restraining order was granted. CHH is temporarily enjoined from further stock repurchases, changing its capital structure or issuing any equity securities and from recommending the voting of General Cinema's convertible preferred shares other than in proportion to the votes of CHH's unaffiliated shareholders. Before the court now is the SEC's application for a preliminary injunction. Because of the court's ruling that it would entertain no further request for equitable relief *pendente lite* which would affect General Cinema's rights with respect to its convertible preferred unless it were joined as a defendant, F.R.Civ.P. 19(a), the relief now sought by the SEC differs significantly from that sought earlier. However, because the application is being denied, it is unnecessary to consider the difficult question of the proper scope of interim injunctive relief.[4]

---

**3.** Under its counterclaim in the private action, Limited sought a temporary restraining order, primarily to restrain CHH's repurchase of its shares, as an illegal tender offer. The application was denied and the hearing on its application for a preliminary injunction was taken off calendar by Limited.

**4.** The SEC has elected not to join General Cinema as a party-defendant. In lieu of any relief directly affecting General Cinema's rights with respect to its convertible preferred shares, the SEC seeks mandatory preliminary injunctive relief, requiring CHH to issue 17.9 million shares of its common stock to a trustee, who would be required to vote such shares in the same propor-

The Williams Act amendments to the Exchange Act were enacted in 1968, in response to the growing use of tender offers to achieve corporate control. Although contests for corporate control through proxy contests or exchange offers already were subject to regulation, intensive campaigns for corporate control through solicitation of stock proliferated. Cash tenders for such stock operated to remove many contests for control from the protective reach of the existing disclosure requirements of the Exchange Act. *See Piper v. Chris Craft Indus.*, 430 U.S. 1, 22, 97 S.Ct. 926, 939, 51 L.Ed.2d 124 (1976).

Section 13(e) of the Exchange Act, enacted as part of the Williams Act amendments, authorizes the SEC to adopt appropriate rules and regulations to bar fraudulent, deceptive or manipulative acts when an issuer commences a tender offer for or repurchases its own stock. HR Rep. 1711, 90th Cong. 2nd Sess., *reprinted in* 1968 U.S.Code Cong. & Ad.News 2811, 2814–15, 1968. ("HR 1711"). That Congress did not consider all issuer repurchases to be tender offers is evident in the legislative history. Although Congress was aware that "substantial repurchase programs will inevitably affect market performance and price levels" and thereby cause natural market pressure, Hearings on S.510, before Subcommittee on Securities of Senate Committee on Banking and Currency, 90th Cong. 1st Sess, at 27, 37 (1967) (statement of Manuel F. Cohen, Chairman, SEC) ("Hearing Statement"), it did not bar issuer repurchases or require them to be regulated as tender offers. Instead, by enacting § 13(e), Congress gave the SEC the rulemaking authority to regulate issuer repurchases to ensure that "shareholders of a company and other persons interested in the market price of its stock should have full information regarding the company's activities and intentions in repurchasing its own stock." HR 1711 at 2814–15. Had Congress wished to treat all issuer repurchases as tender offers, it simply would

have included such repurchases in the general tender offer provision of § 14(d) of the Exchange Act, 15 U.S.C. § 78n(d).

Pursuant to its legislative grant of authority, the SEC promulgated Rule 13e–1, 17 C.F.R. § 240.13e–1, which specifically authorizes open market repurchases by an issuer in the face of a hostile tender offer. Rule 13e–1 requires the issuer who decides to pursue an open market purchase program to disclose to its shareholders relevant facts underlying the repurchase program. It is uncontroverted that CHH complied with the requirements of Rule 13e–1 when it filed its Rule 13e–1 Transaction Statement with the SEC.

The SEC also promulgated Rule 13e–4, 17 C.F.C. § 240.13e–4, which requires that issuer tender offers be subject to more rigorous disclosure and protective requirements than under Rule 13e–1. These requirements include full disclosure by the issuer, withdrawal rights for tendering shareholders, proration in the event the issuer receives more tenders than desired and equality in price for all shareholders who tender. *Id.*

The SEC contends that CHH's repurchase program was an "unconventional" tender offer and, thus, violated § 13(e)(1) of the Exchange Act, because it was not in compliance with Rule 13e–4.

■ Neither Congress nor the SEC has defined "tender offer" or "issuer tender offer." This omission in the Act was deliberate, Congress having intended that the term be defined "on a case-by-case basis." *Smallwood v. Pearl Brewing Co.*, 489 F.2d 579 (5th Cir.), *cert. denied*, 419 U.S. 873, 95 S.Ct. 134, 42 L.Ed.2d 113 (1974). To this end, the SEC has adopted an eight-factor objective test against which the actions of a purchaser are to be assessed in order to determine whether the indicia of a tender offer are present. This eight-factor test has met generally with judicial approval, although both the SEC and the courts have

tion as the votes of CHH's unaffiliated shareholders. Such shares apparently would be held

by the trustee pending trial on the merits.

stressed that all eight factors need not be present.

See, e.g., Zuckerman v. Franz, 573 F.Supp. 351, 358 (S.D.Fla.1983); Wellman v. Dickinson, 475 F.Supp. 783, 823–24 (S.D. N.Y.1979), aff'd, 682 F.2d 355 (2d Cir.1982), cert. denied, —— U.S. ——, 103 S.Ct. 1522, 75 L.Ed.2d 946 (1983); Hoover Co. v. Fuqua Indus., Inc. [1979–80 Transfer Binder] Fed.Sec.L.Rep. (CHH) ¶ 97,107 at 96,148 (N.D.Ohio 1979). As set forth in Wellman, the eight factors are:

(1) active and widespread solicitation of public shareholders for the shares of an issuer;

(2) solicitation made for a substantial percentage of the issuer's stock;

(3) offer to purchase made at a premium over the prevailing market price;

(4) terms of the offer are firm rather than negotiable;

(5) offer contingent on the tender of a fixed number of shares, often subject to a fixed maximum number to be purchased;

(6) offer open only for a limited period of time;

(7) offeree subjected to pressure to sell his stock; and

(8) the public announcements of a purchasing program concerning the target company precede or accompany rapid accumulation of a large amount of target company's securities. 475 F.Supp. at 823–4.

The SEC first contends that CHH's repurchase program is a tender offer under the eight-factor test. For the reasons below, I disagree.

1. There was no "active and widespread solicitation of public shareholders".

█ The SEC contends that because CHH publicly announced its intention to commence purchasing its common stock in a press release, in a letter to shareholders, and in its filings with the Commission, it engaged in "active and widespread solicitation." It further contends that because of media attention and the resultant widespread public knowledge of CHH's offer, "direct solicitation of shareholders would have been redundant." (Pltf's. Memo. in Supp. at 19.) It is not contended that these minimal disclosures were not required and appropriate for a repurchase program under Rule 13e–1. It would be perverse to hold that required disclosure under one rule[5] is a prohibited solicitation under another rule. See Ludlow Corp. v. Tyco Laboratories, Inc., 529 F.Supp. 62, 69 (D.Mass. 1981); Crane Co. v. Harsco Corp., 511 F.Supp. 294, 303 (D.Del.1981).

The real burden of the Commission's argument here is that because of the widespread publicity this control contest has received, this factor should be deemed met. This is no more than stating that in a case such as this, this factor need not be present. Be that as it may, I find that this factor is not here present. This case is similar to Brascan Ltd. v. Edper Equities Ltd., 477 F.Supp. 773 (S.D.N.Y.1979), where the court found that there was no tender offer because, inter alia, defendant "scrupulously avoided any solicitation upon the advice of its lawyers." Id. at 789. Here, the evidence is uncontroverted that pursuant to counsel's instructions to Morgan Stanley (CHH's investment banker and purchasing agent), no direct solicitation of shareholders, including arbitrageurs, occurred. (Osborne Aff. No. 1 ¶ 2(a); Osborne Aff. No. 2 ¶ 28.)

2. Solicitation for a Substantial Percentage of the Issuer's Stock.

Although it is true that a "substantial percentage" of the issuer's stock was involved, more than 50 percent of CHH's common stock outstanding prior to the commencement of the repurchase program, because no "solicitation" was involved, this factor is absent. CHH shareholders certainly were aware that a "substantial" re-

---

5. The SEC disclosure statements were filed pursuant to Rules 13e–1 and 14e–2. The press release was issued pursuant to NYSE Rule 202.-05 which requires a listed company "to release quickly to the public any news or information which might reasonably be expected to materially affect the value for its securities."

purchase was contemplated; however, for the reasons stated above, it cannot be said that the shareholders were "solicited" for this amount.

3. *The offer to purchase was not made at a premium over the prevailing market price.*

■ The SEC contends that CHH's defensive actions caused shareholders to believe that the Offer "was no longer viable and that the premium offered by Limited would not be available." Accordingly, the price "offered" by CHH in its repurchase program, which varied from $24 to $26 per share, "was a premium over the next best alternative price at which the stock would be expected to trade when CHH discontinued its purchases—the pre-tender offer level of the stock (approximately $22)." (Pltf's. Memo. in Supp. at 20.) However, the SEC's analysis ignores the plain language of this third indicium, namely, a premium over the prevailing market price. CHH paid precisely the prevailing market prices in its purchases on the NYSE and PSE.

The SEC itself previously has taken the position that "premium" is a price in excess of the market. In Exchange Act Release No. 16285, "Proposed Amendments to Tender Offer Rules" [1979–80 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 82,374 (1979), the SEC stated that a tender offer price must represent a premium in excess of the greater of 5% or $2 *above the current market price* of the securities being sought." (Footnote omitted; emphasis added.) The Release further defined "current market price" as referring to "the higher of the last sale price or the highest current independent bid." *Id.* at 82,603 & n.14.

The Commission's position in this action, which seeks to define premium on the basis of a theoretical "unaffected market price", is both unworkable and untenable. Economists' opinions in this regard varied widely as to the relative effect of the Offer and

Amended Offer and CHH's defensive actions on the actual market price of CHH stock. Attempts to ascertain a hypothetical unaffected price from such disparate opinions would be nothing less than sheer speculation.[6] Absolutely no certainty or guidance would be available to the investment community. For these reasons, "premium" can be analyzed only in the context of the prevailing market price at the time of the subject purchase or offer. As stated in *LTV Corp. v. Grumman Corp.*, 526 F.Supp. 106, 109 & n. 7 (E.D.N.Y.1981),

> Plaintiff's suggestion that [defendant's] purchase of the shares at a higher price than the previous [market price], an increase resulting from the intense demand by [defendant], represented a premium over market, overlooks the basic principle that price is determined by supply and demand.

4. *The terms of the offer were not firm.*

■ Here, the SEC focuses on the fact that there was no negotiation with respect to the repurchased shares. This was true only in the sense that there is no "negotiation" on an auction market, such as the NYSE. The prices were set by the normal market forces in such a market. There was no firm price condition attached to the program. Rather, CHH engaged in transactions at many different market prices. Nor, as explained below, was the offer "firm" in any other respect associated with that term. I find that the offer was not a "firm offer".

5. *CHH's purchases were not contingent on the tender of a fixed number of shares.*

The SEC concedes that "this factor was not met by the Carter Hawley offer." (Pltf's Memo. in Supp. at 21.)

---

6. It must be remembered that this determination must be made by the purchaser/offeror prior to the time the repurchase program or

tender offer is commenced, so that the applicable regulations can be complied with.

**6.** *The offer was not open only for a limited period of time.*

■ In announcing its offer, CHH stated that it would purchase the common stock of shareholders who wanted to sell "at this time." Based upon this statement and the maximum amount of shares to be purchased, the SEC contends that "shareholders could only conclude that the offer would remain open for a short period of time." (Pltf's Memo. in Supp. at 21.) However, any sense of urgency felt by the shareholders was due as much to the Offer as to CHH's repurchase announcement. Indeed, CHH's 13e–1 Transaction Statement expressly stated that its purchases will be made "during the pendency of the tender offer of The Limited."[7] Thus, the period that CHH's offer would remain open was as much determined by Limited's moves as its own and certainly was not fixed by CHH.

**7.** *Pressure.*

■ The SEC contends that CHH's April 16 announcements caused shareholders to believe that the Offer would not be successful. This belief, coupled with CHH's willingness to purchase its common stock at what the SEC contends were inflated prices, caused an "overwhelming supply response to the acquisition program." Such response, the SEC contends, "is the best evidence of the tremendous pressure applied by Carter Hawley." (Pltf's. Memo. in Supp. at 19.) Although it cannot be doubted that many shareholders felt compelled to sell their shares to CHH, as evidenced by the supply response, other market forces, including the Offer, contributed to the pressure.

Some courts have taken the position that the pressure that the Williams Act attempts to eliminate, in the context of a tender offer, is pressure caused by "a high premium with the threat that the offer will disappear as of a certain time." *Brascan*, 477 F.Supp. at 792. In *Ludlow*, 529

F.Supp. at 68, the court stated that when defendant's buying activities are examined together, it is clear that Ludlow shareholders were not pressured by premiums, fixed terms, limited times or active solicitation into making hasty, ill-advised decisions to sell.

I do find that CHH pressured its shareholders in the sense that courts have found pressure based on the total effect of the offer on the shareholders, independent of the other indicia of a tender offer. *See e.g., S–G Sec., Inc., v. Fuqua Inv. Co.,* 466 F.Supp. 1114 (D.Mass.1978); *Crane Co.,* 511 F.Supp. at 1302; *Hoover Co., supra,* at 96,150.

**8.** *Public announcement accompanying rapid accumulation of large amounts of securities.*

■ It is uncontroverted that CHH repurchased over 50% of its outstanding shares over a period of seven trading days. Therefore, I find that this factor is present in this case.

■ Although, as mentioned, it is not necessary that each of the eight factors be present in order to find a stock purchase to be a tender offer, where, as here, only two of the eight indicia are present, I cannot say that the "eight-factor" test has been met. Therefore, under this test, CHH's repurchase program does not constitute a tender offer.

Plaintiff nevertheless urges that CHH's repurchase program constitutes a tender offer within the meaning of the Williams Act, under the standard set forth in *S–G Securities.* Under the *S–G Securities* test, a tender offer is present if there are (1) a publicly announced intention by the purchaser to acquire a substantial block of the stock of the target company for purposes of acquiring control thereof, and (2) a subsequent rapid acquisition by the purchaser of large blocks of stock through open mar-

---

**7.** CHH's Schedule 14D–9, Amend. No. 6, filed on April 23, 1984, disclosed that CHH was "continuing to explore and investigate" further stock repurchases.

ket and privately negotiated purchases. 466 F.Supp. at 1126–27.[8]

Plaintiff contends that application of the *S–G Securities* "two-pronged" test is supported by the legislative history of the Williams Act, and by various policy considerations underlying the Act's purpose. First, the SEC argues, the Act was intended to protect shareholders from having to make uninformed investment decisions in the face of a cash takeover bid or other stock acquisitions which may cause a shift in corporate control. 113 Cong.Rec. 856 (1967). Cash tender offers, open only for short periods of time, did not provide stockholders with material information necessary to evaluate the various options presented, nor did all tendering shareholders receive equal treatment. Thus, the Williams Act was designed to protect against a shareholder being forced to make rapid investment decisions under pressure. Hearing Statement at 17. The Commission maintains that the *S–G* test effectively addresses the primary evil sought to be remedied by the Williams Act—that of undue pressure forcing shareholders to make uninformed investment decisions.

Although this characterization of the general purposes of the Williams Act is certainly accurate, the legislative history also clearly establishes that Congress intended to distinguish between tender offers on the one hand, and open market purchases on the other. Thus, it was contemplated that disclosure of substantial open market or privately negotiated purchases of shares *after* the transaction, would avoid "upsetting the free and open auction market where buyer and seller normally do not disclose the extent of their interest ...". 113 Cong.Rec. 856 (1968). As argued by defendant, the Williams Act permits a corporation two distinct alternatives when purchasing stock: (1) tender offers, which are subject to disclosure requirements prior to the commencement of the offer; and (2) open market purchases, or negotiated block trades, which are subject to disclosure re-

quirements within 10 days after the acquisition.

More importantly, the legislative history demonstrates that Congress was aware that corporate repurchase programs, adopted for any number of purposes, might affect market performance and price levels. Hearing Statement at 27. It was contemplated that corporate management might utilize repurchase programs to "preserve or strengthen their control by counteracting tender offers or other attempted takeovers...". H.R. 1711 at 2814–15. Regulation of corporate repurchase programs was thus authorized separately in § 13(d) of the Williams Act. Congress did not specifically require issuer repurchases to be regulated as tender offers. However, pursuant to its legislative grant of authority the SEC, in 1979, adopted Rule 13e–4, which effectively distinguishes between issuer tender offers and open market repurchases along the same lines as non-issuer offers and open market purchases.

■ The eight-factor analysis, unlike the *S–G Securities* test, provides a reasonably comprehensive scheme for determining whether conduct subject to regulation under the Williams Act is governed by Rule 13e–1, relating to open market purchases, or Rule 13e–4, relating to issuer tender offers. While the *S–G Securities* test may appropriately focus on the need to protect shareholders against the pressures created by highly publicized open market purchases, the test fails to set forth any objective standards by which to distinguish between actions constituting a tender offer and actions merely amounting to aggressive open market purchases. Thus, the standard urged by the SEC fails adequately to apprise stock purchasers how to determine whether their conduct is governed by the tender offer or open market purchase provisions of the Williams Act. The eight-factor analysis more properly effectuates Con-

---

**8.** At the hearing on plaintiff's application for a temporary restraining order, the court suggested that the test contended for by the SEC was "that a target company's open market purchase

program amounts to a self-tender offer if, under the totality of the circumstances, extraordinary pressure is brought to bear on investors to act hurriedly or precipitously."

gress' apparent intent to impose differing requirements on the two types of action.

Although Congress was aware that substantial repurchase programs might be employed by target companies to defeat a hostile tender offer, Congress did not intimate that such defensive measures would, in all circumstances, amount to a tender offer. The Commission is unable to point to a single example of a defensive repurchase program which, under its proposed analysis, would not be governed by the disclosure requirements of Rule 13e–4, *i.e.*, would not be a tender offer. Thus, a target company desiring to ward off a hostile takeover bid would be required to proceed under Rule 13e–4 regardless of the ultimate consequences of its repurchase program. Abandonment of the eight-factor analysis would, in effect, abolish Rule 13e–1 in the context of repurchase programs designed to defeat hostile tender offers. The SEC has never promulgated any such rule.

The *S–G Securities* test, which requires proof of the rapid acquisition by the purchaser of large blocks of stock subsequent to a public announcement by the purchaser of its intent to acquire the stock, is in large measure a hindsight test. The target company whose repurchase program does not result in the rapid acquisition of stock, will have met the requirements of the Williams Act by filing under Rule 13e–1. However, the target cannot know, prior to inception of the repurchase program, whether a massive response in the marketplace will create the type of pressure causing investors to act hurriedly or precipitously.

Although neither analysis enables target companies to ascertain with certainty whether their actions run afoul of the Williams Act, abandonment of the eight-factor analysis would render any such determination almost entirely a matter of subjective judgment. Liability under the Williams Act should not be premised upon a standard which fails to afford notice of the conduct required to comply with the Act.

For these reasons, I decline to adopt the kind of subjective, judgmental test contended for by the Commission. Because, the SEC has not carried its burden on this application of establishing either that past violations have occurred, as a predicate for meeting the reasonable likelihood of future violations test, *see SEC v. Koracorp Indus., Inc.*, 575 F.2d 692, 697 (9th Cir.) *cert. denied*, 439 U.S. 953, 99 S.Ct. 348, 58 L.Ed.2d 343 (1978), or that it has a "fair chance of success on the merits", *Benda v. Grand Lodge, IAM*, 584 F.2d 308, 315 (9th Cir.1978), *cert. dismissed*, 441 U.S. 937, 99 S.Ct. 2065, 60 L.Ed.2d 667 (1979), the application for a preliminary injunction will be denied.

ORDER

IT IS THEREFORE ORDERED:

1. Plaintiff's application for a preliminary injunction is denied.

2. The temporary restraining order heretofore issued is continued in effect until 6:00 p.m., PDT, May 9, 1984, or until the Court of Appeals acts on any request by plaintiff for emergency relief, whichever is the sooner. This is, in effect, an injunction pending appeal under F.R.Civ.P. 62(c) to enable plaintiff to seek relief from the Court of Appeals prior to the expiration of the Amended Offer and is granted because there is no law of the circuit on one of the issues raised on this application.

3. The motion of General Cinema, applicant in intervention, to withdraw its application to intervene without prejudice is granted.

This memorandum decision is intended to serve as the Court's findings of fact and conclusions of law pursuant to F.R.Civ.P. 52(a).