**SECURITIES AND EXCHANGE COMMISSION, Plaintiff-Appellant,**

v.

**CARTER HAWLEY HALE STORES, INC., Defendant-Appellee.**

Nos. 84–5897, 84–6001.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted April 3, 1985.

Decided May 13, 1985.

Paul Gonson, Washington, D.C., for plaintiff-appellant.

Gwen L. Feder, Michael H. Diamond, Skadden Arps, Slate, Meagher & Flom, Los Angeles, Cal., for defendant-appellee.

Before GOODWIN, SNEED, and SKOPIL, Circuit Judges.

SKOPIL, Circuit Judge:

The issue in this case arises out of an attempt by The Limited ("Limited"), an Ohio corporation, to take over Carter Hawley Hale Stores, Inc. ("CHH"), a publicly-held Los Angeles corporation. The SEC commenced the present action for injunctive relief to restrain CHH from repurchasing its own stock in an attempt to defeat the Limited takeover attempt without complying with the tender offer regulations. The district court concluded CHH's repurchase program was not a tender offer. The SEC appeals from the district court's denial of its motion for a preliminary injunction. We affirm.

## FACTS AND PROCEEDINGS BELOW

On April 4, 1984 Limited commenced a cash tender offer for 20.3 million shares of CHH common stock, representing approximately 55% of the total shares outstanding, at $30 per share. Prior to the announced offer, CHH stock was trading at approximately $23.78 per share (pre-tender offer price). Limited disclosed that if its offer succeeded, it would exchange the remaining CHH shares for a fixed amount of Limited shares in a second-step merger.

In compliance with section 14(d) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78n(d) (1982), Limited filed a schedule 14D–1 disclosing all pertinent information about its offer. The schedule stated that (1) the offer would remain open for 20-days, (2) the tendered shares could be withdrawn until April 19, 1984, and (3) in the event the offer was oversubscribed, shares would be subject to purchase on a pro rata basis.

While CHH initially took no public position on the offer, it filed an action to enjoin Limited's attempted takeover. *Carter Hawley Hale Stores, Inc. v. The Limited, Inc.*, 587 F.Supp. 246 (C.D.Cal.1984). CHH's motion for an injunction was denied. *Id.* From April 4, 1984 until April 16, 1984 CHH's incumbent management discussed a response to Limited's offer. During that time 14 million shares, about 40% of CHH's common stock, were traded. The price of CHH stock increased to approximately $29.25 per share. CHH shares became concentrated in the hands of risk arbitrageurs.

On April 16, 1984 CHH responded to Limited's offer. CHH issued a press release announcing its opposition to the offer because it was "inadequate and not in the best interests of CHH or its shareholders." CHH also publicly announced an agreement with General Cinema Corporation ("General Cinema"). CHH sold one million shares of convertible preferred stock to General Cinema for $300 million. The preferred shares possessed a vote equivalent to 22% of voting shares outstanding. General Cinema's shares were to be voted pursuant to CHH's Board of Directors recommendations. General Cinema was also granted an option to purchase Walden Book Company, Inc., a profitable CHH subsidiary, for approximately $285 million. Finally, CHH announced a plan to repurchase up to 15 million shares of its own common stock for an amount not to exceed $500 million. If all 15 million shares were purchased, General Cinema's shares would represent 33% of CHH's outstanding voting shares.

CHH's public announcement stated the actions taken were "to defeat the attempt by Limited to gain voting control of the company and to afford shareholders who wished to sell shares at this time an opportunity to do so." CHH's actions were revealed by press release, a letter from

CHH's Chairman to shareholders, and by documents filed with the Securities and Exchange Commission ("SEC")—a Schedule 14D-9 and Rule 13e-1 transaction statement. These disclosures were reported by wire services, national financial newspapers, and newspapers of general circulation. Limited sought a temporary restraining order against CHH's repurchase of its shares. The application was denied. Limited withdrew its motion for a preliminary injunction.

CHH began to repurchase its shares on April 16, 1984. In a one-hour period CHH purchased approximately 244,000 shares at an average price of $25.25 per share. On April 17, 1984 CHH purchased approximately 6.5 million shares in a two-hour trading period at an average price of $25.88 per share. By April 22, 1984 CHH had purchased a total of 15 million shares. It then announced an increase in the number of shares authorized for purchase to 18.5 million.

On April 24, 1984, the same day Limited was permitted to close its offer and start purchasing, CHH terminated its repurchase program having purchased approximately 17.5 million shares, over 50% of the common shares outstanding. On April 25, 1984 Limited revised its offer increasing the offering price·to $35.00 per share and eliminating the second-step merger. The market price for CHH then reached a high of $32.00 per share. On May 21, 1984 Limited withdrew its offer. The market price of CHH promptly fell to $20.62 per share, a price below the pre-tender offer price.

On May 2, 1984, two and one-half weeks after the repurchase program was announced and one week after its apparent completion,[1] the SEC filed this action for injunctive relief. The SEC alleged that CHH's repurchase program constituted a

tender offer conducted in violation of section 13(e) of the Exchange Act, 15 U.S.C. § 78m(e) and Rule 13e-4, 17 C.F.R. § 240.-13e-4. On May 5, 1984 a temporary restraining order was granted. CHH was temporarily enjoined from further stock repurchases. The district court denied SEC's motion for a preliminary injunction, finding the SEC failed to carry its burden of establishing "the reasonable likelihood of future violations ... [or] ... a 'fair chance of success on the merits'....'" *SEC v. Carter Hawley Hale Stores, Inc.*, 587 F.Supp. 1248, 1257 (C.D.Cal.1984) (citations omitted). The court found CHH's repurchase program was not a tender offer because the eight-factor test proposed by the SEC and adopted in *Wellman v. Dickinson*, 475 F.Supp. 783 (S.D.N.Y.1979), *aff'd on other grounds*, 682 F.2d 355 (2d Cir.1982), *cert. denied*, 460 U.S. 1069, 103 S.Ct. 1522, 75 L.Ed.2d 946 (1983), had not been satisfied. *SEC v. Carter Hawley Hale Stores, Inc.*, 587 F.Supp. at 1255. The court also refused to adopt, at the urging of the SEC, the alternative test of what constitutes a tender offer as enunciated in *S-G Securities, Inc. v. Fuqua Investment Co.*, 466 F.Supp. 1114 (D.Mass.1978). 587 F.Supp. at 1256-57. On May 9, 1984 the SEC filed an emergency application for an injunction pending appeal to this court. That application was denied.

## DISCUSSION

■ The grant or denial of a preliminary injunction is reviewed to determine if the district court abused its discretion. *Lopez v. Heckler*, 725 F.2d 1489, 1497 (9th Cir.), *rev'd on other grounds*, 463 U.S. 1328, 104 S.Ct. 10, 77 L.Ed.2d 1431 (1984). A district court abuses its discretion if it rests its conclusion on clearly erroneous factual findings or an incorrect legal standard. *Id.; Apple Computer, Inc. v. For-*

---

**1.** In addition to seeking to enjoin further stock purchases, the SEC sought preliminary injunctive relief requiring CHH to issue 17.9 million shares of its common stock to trustees who, pending a trial on the merits, would be required to vote such shares in the same proportion as the votes of unaffiliated shareholders. This matter therefore is not moot.

*mula International, Inc.,* 725 F.2d 521, 523 (9th Cir.1984).

The SEC urges two principal arguments on appeal: (1) the district court erred in concluding that CHH's repurchase program was not a tender offer under the eight-factor *Wellman* test, and (2) the district court erred in declining to apply the definition of a tender offer enunciated in *S–G Securities,* 466 F.Supp. at 1126–27. Resolution of these issues on appeal presents the difficult task of determining whether CHH's repurchase of shares during a third-party tender offer itself constituted a tender offer.

1. The Williams Act.

A. Congressional Purposes

The Williams Act amendments to the Exchange Act were enacted in response to the growing use of tender offers to achieve corporate control. *Edgar v. Mite Corp.,* 457 U.S. 624, 632, 102 S.Ct. 2629, 2635, 73 L.Ed.2d 269 (1982) (*citing Piper v. Chris-Craft Industries,* 430 U.S. 1, 22, 97 S.Ct. 926, 939, 51 L.Ed.2d 124 (1977)). Prior to the passage of the Act, shareholders of target companies were often forced to act hastily on offers without the benefit of full disclosure. *See* H.R.Rep. No. 1711, 90th Cong., 2d Sess. (1968), *reprinted in* 1968 U.S.Code, Cong. & Admin.News 2811 (*"House Report 1711"*).[2] The Williams Act was intended to ensure that investors responding to tender offers received full and fair disclosure, analogous to that received in proxy contests. The Act was also designed to provide shareholders an opportunity to examine all relevant facts in an effort to reach a decision without being subject to unwarranted pressure. *House Report 1711.*

This policy is reflected in section 14(d), which governs third-party tender offers,

and which prohibits a tender offer unless shareholders are provided with certain procedural and substantive protections including: full disclosure; time in which to make an investment decision; withdrawal rights; and pro rata purchase of shares accepted in the event the offer is oversubscribed. 15 U.S.C. § 78n(d) (1981); 17 C.F.R. § 240.-14d–6 (1984); 17 C.F.R. § 240.14d–7(a)(1)–14d–7(a)(2) (1984).

There are additional congressional concerns underlying the Williams Act. In its effort to protect investors, Congress recognized the need to "avoid favoring either management or the takeover bidder." *Edgar,* 456 U.S. at 633, 102 S.Ct. at 2636; *see also Financial General Bank Shares, Inc. v. Lance,* [1978] Fed.Sec.L.Rptr. (CCH) ¶ 96,403 at 93,424–25 (D.D.C.1978) (*quoting Rondeau v. Mosinee Paper Corp.,* 422 U.S. 49, 58, 95 S.Ct. 2069, 2075, 45 L.Ed.2d 12 (1975)). The Supreme Court has recognized that to serve this policy it is necessary to withhold "from management or the bidder any undue advantage that could frustrate the exercise of informed choice." *Edgar,* 456 U.S. at 634, 102 S.Ct. at 2636–37. Congress was also concerned about avoiding undue interference with the free and open market in securities. *City Investing Co. v. Simcox,* 633 F.2d 56, 62 n. 14 (7th Cir.1980) (noting less burdensome regulations in cases involving certain open market purchases); *see also* 113 Cong.Rec. 856 (1968). Each of these congressional concerns is implicated in the determination of whether CHH's issuer repurchase program constituted a tender offer.

B. Issuer Repurchases Under Section 13(e)

Issuer repurchases and tender offers are governed in relevant part by section 13(e)

---

**2.** For additional discussion of the concerns giving rise to the Williams Act amendments, *see Full Disclosure of Corporate Equity Ownership and in Corporate Takeover Bids: Hearing on S. 510 Before the Subcommittee on Securities of the Senate Committee on Banking and Currency,* 90th Cong., 1st Sess. (1967) ("Senate Hearings"); *Takeover Bids: Hearing on H.R. 14475, and S. 510 Before the Subcommittee on Commerce and Finance of the House Committee on Interstate and Foreign Commerce,* 90th Cong., 2d Sess. (1968) ("House Hearings").

of the Williams Act and Rules 13e–1 and 13e–4 promulgated thereunder. 15 U.S.C. § 78m(e) (1981); 17 C.F.R. § 240.13e–1 (1984); 17 C.F.R. § 240.13e–4 (1984).

The SEC argues that the district court erred in concluding that issuer repurchases, which had the intent and effect of defeating a third-party tender offer, are authorized by the tender offer rules and regulations. The legislative history of these provisions is unclear. Congress apparently was aware of an intent by the SEC to regulate issuer tender offers to the same extent as third-party offers. *Senate Hearings* 214–16, 248; Exchange Act Release No. 16,112 [1979] Fed.Sec.L.Rptr. (CCH) ¶ 82,182 at 82,205 (Aug. 16, 1979) (proposed amendments to tender offer rules). At the same time, Congress recognized issuers might engage in "substantial repurchase programs ... inevitably affect[ing] market performance and price levels." *House Hearings* at 14–15; *see also House Report 1711*, U.S.Code Cong. & Admin.News 1968, at 2814–15. Such repurchase programs might be undertaken for any number of legitimate purposes, including with the intent "to preserve or strengthen ... control by counteracting tender offer or other takeover attempts...." *House Report 1711*, U.S.Code Cong. & Admin.News 1968, at 2814; *House Hearings* at 15. Congress neither explicitly banned nor authorized such a practice. Congress did grant the SEC authority to adopt appropriate regulations to carry out congressional intent with respect to issuer repurchases. The legisla-

tive history of section 13(e) is not helpful in resolving the issues.

There is also little guidance in the SEC Rules promulgated in response to the legislative grant of authority. Rule 13e–1 prohibits an issuer from repurchasing its own stock during a third-party tender offer unless it discloses certain minimal information. 17 C.F.R. § 240.13e–1 (1984). The language of Rule 13e–1 is prohibitory rather than permissive. It nonetheless evidences a recognition that not all issuer repurchases during a third-party tender offer are tender offers. *Id.* In contrast, Rule 13e–4 recognizes that issuers, like third parties, may engage in repurchase activity amounting to a tender offer and subject to the same procedural and substantive safeguards as a third-party tender offer. 17 C.F.R. § 240.13e–4 (1984). The regulations do not specify when a repurchase by an issuer amounts to a tender offer governed by Rule 13e–4 rather than 13e–1.[3]

We decline to adopt either the broadest construction of Rule 13e–4, to define issuer tender offers as virtually all substantial repurchases during a third-party tender offer, or the broadest construction of Rule 13e–1, to create an exception from the tender offer requirements for issuer repurchases made during a third-party tender offer. Like the district court, we resolve the question of whether CHH's repurchase program was a tender offer by considering the eight-factor test established in *Wellman*, 587 F.Supp. at 1256–57.[4]

---

**3.** The procedural and substantive requirements that must be complied with under Rule 13e–4 differ from those under Rule 13e–1. An issuer engaged in a repurchase under Rule 13e–1 is required to file a brief statement with the SEC setting forth the amount of shares purchased; the purpose for which the purchase is made; and the source and amount of funds used in making the repurchase. 17 C.F.R. § 240.13e–1 (1984). CHH complied with the requirements of Rule 13e–1.

An issuer engaged in a tender offer under Rule 13e–4 must comply with more burdensome regulations. All the substantive and procedural

protections for shareholders come into play under Rule 13e–4 including: full disclosure; time in which to make investment decisions; withdrawal rights; and requirements for pro rata of shares. 17 C.F.R. § 240.13e–4 (1984). CHH did not comply with Rule 13e–4.

**4.** We have followed the *Wellman* test in another context, *see Polinsky v. MCA, Inc.,* 680 F.2d 1286, 1290–91 (9th Cir.1982) (open market purchases made in anticipation of a tender offer met none of the *Wellman* indicia), but have not addressed the question of the applicability of the *Wellman* factors to issuer repurchase programs during third-party tender offers.

To serve the purposes of the Williams Act, there is a need for flexibility in fashioning a definition of a tender offer. *See Smallwood v. Pearl Brewing Co.,* 489 F.2d 579 (5th Cir.), *cert. denied,* 419 U.S. 873, 95 S.Ct. 134, 42 L.Ed.2d 113 (1974). The *Wellman* factors seem particularly well suited in determining when an issuer repurchase program during a third-party tender offer will itself constitute a tender offer. *Wellman* focuses, *inter alia,* on the manner in which the offer is conducted and whether the offer has the overall effect of pressuring shareholders into selling their stock. *Wellman,* 475 F.Supp. at 823–24. Application of the *Wellman* factors to the unique facts and circumstances surrounding issuer repurchases should serve to effect congressional concern for the needs of the shareholder, the need to avoid giving either the target or the offeror any advantage, and the need to maintain a free and open market for securities.

2. Application of the *Wellman* Factors.

■ Under the *Wellman* test, the existence of a tender offer is determined by examining the following factors:

(1) Active and widespread solicitation of public shareholders for the shares of an issuer; (2) solicitation made for a substantial percentage of the issuer's stock; (3) offer to purchase made at a premium over the prevailing market price; (4) terms of the offer are firm rather than negotiable; (5) offer contingent on the tender of a fixed number of shares, often subject to a fixed maximum number to be purchased; (6) offer open only for a limited period of time; (7) offeree subjected to pressure to sell his stock; [and (8) ] public announcements of a purchasing program concerning the target company precede or accompany rapid accumulation of a large amount of target company's securities.

475 F.Supp. at 823–24.

Not all factors need be present to find a tender offer; rather, they provide some guidance as to the traditional indicia of a tender offer. *Id.* at 824; see also *Zucker-*

*man v. Franz,* 573 F.Supp. 351, 358 (S.D. Fla.1983).

The district court concluded CHH's repurchase program was not a tender offer under *Wellman* because only "two of the eight indicia" were present. 587 F.Supp. at 1255. The SEC claims the district court erred in applying *Wellman* because it gave insufficient weight to the pressure exerted on shareholders; it ignored the existence of a competitive tender offer; and it failed to consider that CHH's offer at the market price was in essence a premium because the price had already risen above pre-tender offer levels.

**A. Active and Widespread Solicitation**

■ The evidence was uncontraverted that there was "no direct solicitation of shareholders." 587 F.Supp. 1253. No active and widespread solicitation occurred. *See Brascan Ltd. v. Edper Equities Ltd.,* 477 F.Supp. 773, 789 (S.D.N.Y.1979) (no tender offer where defendant "scrupulously avoided any solicitation upon the advice of his lawyers"). Nor did the publicity surrounding CHH's repurchase program result in a solicitation. 587 F.Supp. 1253–54. The only public announcements by CHH were those mandated by SEC or Exchange rules. *See Ludlow Corp. v. Tyco Laboratories,* 529 F.Supp. 62, 68–69 (D.Mass.1981) (schedule 13d filed by purchaser could not be characterized as forbidden publicity); *Crane Co. v. Harsco Corp.,* 511 F.Supp. 294, 303 (D.Dela.1981) (Rule 13e–1 transaction statement and required press releases do not constitute a solicitation); *but cf. S–G Securities, Inc.,* 466 F.Supp. at 1119–21 (tender offer present where numerous press releases publicized terms of offer).

**B. Solicitation for a Substantial Percentage of Issuer's Shares**

Because there was no active and widespread solicitation, the district court found the repurchase could not have involved a solicitation for a substantial percentage of CHH's shares. 587 F.Supp. 1253–54. It is unclear whether the proper focus of this

factor is the solicitation or the percentage of stock solicited. The district court probably erred in concluding that, absent a solicitation under the first *Wellman* factor, the second factor cannot be satisfied, *see Hoover Co. v. Fuqua Industries,* [1979–80] Fed.Sec.L.Rprt. (CCH) ¶ 97,107 at 96,148 n. 4 (N.D.Ohio 1979) (second *Wellman* factor did not incorporate the type of solicitation described in factor one), but we need not decide that here. The solicitation and percentage of stock elements of the second factor often will be addressed adequately in an evaluation of the first *Wellman* factor, which is concerned with solicitation, and the eighth *Wellman* factor, which focuses on the amount of securities accumulated. In this case CHH did not engage in a solicitation under the first *Wellman* factor but did accumulate a large percentage of stock as defined under the eighth *Wellman* factor. An evaluation of the second *Wellman* factor does not alter the probability of finding a tender offer.

### C. Premium Over Prevailing Market Price

The SEC contends the open market purchases made by CHH at market prices were in fact made at a premium not over market price but over the pre-tender offer price. At the time of CHH's repurchases, the market price for CHH's shares (ranging from $24.00 to $26.00 per share) had risen above the pre-tender offer price (approximately $22.00 per share). Given ordinary market dynamics, the price of a target company's stock will rise following an announced tender offer. Under the SEC's definition of a premium as a price greater than the pre-tender offer price, a premium will always exist when a target company makes open market purchases in response to a tender offer even though the increase in market price is attributable to the action of the third-party offeror and not the target company. *See LTV Corp. v. Grumman Corp.,* 526 F.Supp. 106, 109 & n. 7 (E.D.N.Y.1981) (an increase in price due to increased demand during a tender offer does not represent a premium). The SEC definition not only eliminates consideration

of this *Wellman* factor in the context of issuer repurchases during a tender offer, but also underestimates congressional concern for preserving the free and open market. The district court did not err in concluding a premium is determined not by reference to pre-tender offer price, but rather by reference to market price. This is the definition previously urged by the SEC, Exchange Act Release No. 16,385 [1979–80] Fed.Sec.L.Rptr. (CCH) ¶ 82,374 at 82,605 (Nov. 29, 1979) (footnotes omitted) (proposed amendments to tender offer rules) (premium defined as price "in excess of … the current market price…."), and is the definition we now apply. *See LTV Corp.,* 526 F.Supp. at 109 & n. 7.

### D. Terms of Offer Not Firm

There is no dispute that CHH engaged in a number of transactions or purchases at many different market prices. 587 F.Supp. at 1254.

### E. Offer Not Contingent on Tender of Fixed Minimum Number of Shares

Similarly, while CHH indicated it would purchase up to 15 million shares, CHH's purchases were not contingent on the tender of a fixed minimum number of shares. 587 F.Supp. at 1254.

### F. Not Open For Only a Limited Time

CHH's offer to repurchase was not open for only a limited period of time but rather was open "during the pendency of the tender offer of The Limited." 587 F.Supp. at 1255. The SEC argues that the offer was in fact open for only a limited time, because CHH would only repurchase stock until 15 million shares were acquired. The fact that 15 million shares were acquired in a short period of time does not translate into an issuer-imposed time limitation. The time within which the repurchases were made was a product of ordinary market forces, not the terms of CHH's repurchase program.

G–H. Shareholder Pressure and Public Announcements Accompanying a Large Accumulation of Stock

With regard to the seventh *Wellman* factor, following a public announcement, CHH repurchased over the period of seven trading days more than 50% of its outstanding shares. 587 F.Supp. at 1255. The eighth *Wellman* factor was met.

The district court found that while many shareholders may have felt pressured or compelled to sell their shares, CHH itself did not exert on shareholders the kind of pressure the Williams Act proscribes. *Id.*

While there certainly was shareholder pressure in this case, it was largely the pressure of the marketplace and not the type of untoward pressure the tender offer regulations were designed to prohibit. *See Panter v. Marshall Field & Co.*, 646 F.2d 271, 286 (7th Cir.) (where no deadline and no premium, shareholders "were simply not subjected to the proscribed pressures the Williams Act was designed to alleviate"), *cert. denied*, 454 U.S. 1092, 102 S.Ct. 658, 70 L.Ed.2d 631 (1981); *Brascan Ltd. v. Edper Equities*, 477 F.Supp. at 789–92 (without high premium and threat that the offer will disappear, large purchases in short time do not represent the kind of pressure the Williams Act was designed to prevent); *Kennecott Copper Corp. v. Curtiss-Wright Corp.*, 449 F.Supp. 951, 961 (S.D.N.Y.), *aff'd in relevant part, rev'd in part*, 584 F.2d 1195, 1207 (2d Cir.1978) (where no deadline and no premium, no pressure, other than normal pressure of the marketplace, exerted on shareholders).

CHH's purchases were made in the open market, at market and not premium prices, without fixed terms and were not contin-gent upon the tender of a fixed minimum number of shares. CHH's repurchase program had none of the traditional indicia of a tender offer. *See, e.g., Energy Ventures, Inc. v. Appalachian Co.*, 587 F.Supp. 734, 739 (D.Del.1984) (major acquisition program involving open market purchases not subject to tender offer regulation); *Ludlow Corp. v. Tyco Laboratories, Inc.*, 529 F.Supp. at 68 (no tender offer where shareholders not pressured into making hasty ill-advised decision due to premium, fixed terms, or active solicitation); *LTV Corp. v. Grumman*, 526 F.Supp. at 109 (massive buying program, with attendant publicity, made with intent to defeat third-party tender offer, not itself a tender offer); *Brascan Ltd. v. Edper Equities*, 477 F.Supp. at 792 (the pressure the Williams Act attempts to eliminate is that caused by "a high premium with a threat that the offer will disappear within a certain time").

The shareholder pressure in this case did not result from any untoward action on the part of CHH. Rather, it resulted from market forces, the third-party offer, and the fear that at the expiration of the offer the price of CHH shares would decrease.

The district court did not abuse its discretion in concluding that under the *Wellman* eight factor test, CHH's repurchase program did not constitute a tender offer.

3. Alternative *S–G Securities* Test.

The SEC finally urges that even if the CHH repurchase program did not constitute a tender offer under the *Wellman* test, the district court erred in refusing to apply the test in *S–G Securities*, 466 F.Supp. at 1114.[5] Under the more liberal

---

5. Some courts have opted for the broader *S–G Securities* definition of a tender offer, *see, e.g., Panter v. Marshall Field & Co.*, 646 F.2d at 286 (also citing *Wellman*); *Hoover Co. v. Fuqua Industries*, [1979–80] Fed.Sec.L.Rptr. (CCH) ¶ 97,-107 at 96,146–149 (also citing *Wellman*); *Nachman Corp. v. Halfred, Inc.*, [1973–74] Fed.Sec.L. Rptr. (CCH) ¶ 94,455 at 95,590 (N.D.Ill.1973); *Cattlemen's Investment Co. v. Fears*, 343 F.Supp. 1248, 1251 (W.D.Okla.1972), *vacated per stipulation*, No. 75–152 (W.D.Okla. May 8, 1972), while other courts have rejected this broad test in favor of the eight-factor *Wellman* test. *See, e.g., Kennecott Copper Corp. v. Curtiss-Wright Corp.*, 584 F.2d at 1207; *LTV Corp. v. Grumman Corp.*, 527 F.Supp. at 109; *Brascan Ltd. v. Edper Equities Ltd.*, 477 F.Supp. at 791; *D–Z Investment Co. v. Holloway*, [1974–75] Fed.Sec.L.Rep. (CCH) ¶ 94,771 at 96,562–63 (S.D.N.Y.1974). There is no one factor other than the result which distinguishes these cases although the greater weight of authority seems to have accepted the *Wellman* test.

S–G Securities test, a tender offer is present if there are

(1) A publicly announced intention by the purchaser to acquire a block of the stock of the target company for purposes of acquiring control thereof, and (2) a subsequent rapid acquisition by the purchaser of large blocks of stock through open market and privately negotiated purchases.

*Id.* at 1126–27.

There are a number of sound reasons for rejecting the *S–G Securities* test. The test is vague and difficult to apply. It offers little guidance to the issuer as to when his conduct will come within the ambit of Rule 13e–4 as opposed to Rule 13e–1. *SEC v. Carter Hawley Hale Stores*, 587 F.Supp. at 1256–57. A determination of the existence of a tender offer under *S–G Securities* is largely subjective and made in hindsight based on an *ex post facto* evaluation of the response in the marketplace to the repurchase program. *Id.* at 1257. The SEC's contention that these concerns are irrelevant when the issuer's repurchases are made with the intent to defeat a third-party offer is without merit. *See, e.g., LTV Corp. v. Grumman Corp.*, 526 F.Supp. at 109–10 (Rule 13e–1 may apply to open market purchases even when made to thwart a tender offer); *Crane Co. v. Harsco Corp.*, 511 F.Supp. 294, 300–301 (D.Dela.1981) (same).

The SEC finds further support for its application of the two-pronged *S–G Securities* test in the overriding legislative intent "to ensure that shareholders ... are adequately protected from pressure tactics ... [forcing them to make] ... ill-considered investment decisions." The *S–G Securities* test does reflect congressional concern for shareholders; however, the same can be said of the *Wellman* test. The legislative intent in the context of open market repurchases during third-party tender offers is, at best, unclear. 587 F.Supp. 1256; *see* pages 949–950, *supra*. The *S–G Securities* test, unlike the *Wellman* test, does little to reflect objectively the multiple congressional concerns underlying the Wil-

liams Act, including due regard for the free and open market in securities. *See* page 948, *supra*.

We decline to abandon the *Wellman* test in favor of the vague standard enunciated in *S–G Securities*. The district court did not err in declining to apply the *S–G Securities* test or in finding CHH's repurchases were not a tender offer under *Wellman*.

AFFIRMED.